[Crim. No. 4048. Second Dist., Div. One. May 29, 1947.]

THE PEOPLE, Respondent, v. HEBER A. SKAGGS,
Appellant.

84

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, and Gilbert F. Nelson, Deputy Attorney General, for Respondent.

WHITE, J.—Defendant was a sergeant of police in the city of Los Angeles and had for some 21 years served as a member of the police department. In an information filed by the district attorney of Los Angeles County defendant was charged with a violation of section 68 of the Penal Code, in that, on July 3, 1945, he did corruptly, knowingly and feloniously ask and agree to receive from one Kelly Petillo a bribe in the sum of $500 for the purpose of influencing the action of said defendant upon a matter then pending and which was before him in his official capacity, to wit, the prosecution of the aforesaid Kelly Petillo upon a charge of assault with a deadly weapon.

To the charge of bribery contained in the foregoing information defendant entered his plea of not guilty. The cause proceeded to trial before a jury which returned a verdict finding the defendant guilty as charged. His motion for a new trial was denied. From the judgment and the order denying his motion for a new trial defendant prosecutes this appeal.

By reason of the grounds urged for a reversal it becomes necessary to narrate in some detail the factual background which, as disclosed by the record, gave rise to this prosecution.

On the night of July 1, 1945, Kelly Petillo owned and operated a cafe and cocktail bar in the city of Los Angeles. At about midnight Petillo became involved in an altercation with two marines who were in his place of business. Police Officers Anderson and Scheidecker approached the entrance of the cocktail bar and observed two marines "standing in the

middle of the floor." At about that time a shot was fired inside the cafe, whereupon the two marines "ran out." Entering the cafe, Officer Anderson was attacked by Petillo but subdued him. After interviewing witnesses the officers placed Petillo under arrest and lodged him in jail at University Police Station. Officer Anderson made out what is called an "arrest report," giving the salient facts of the case and names of witnesses. In accordance with established police practice, further investigation of the case was assigned to the detective bureau. At about 8 o'clock on the morning of July 2, 1945, when the defendant, who was assigned to duty in the detective bureau, reported for duty at University Police Station he discovered that the matter of the arrest and prosecution of Petillo was assigned to him and Officer T. K. Perry, also of the detective bureau, with whom the defendant worked on criminal cases. Officer Perry, however, was not on duty during the day of July 2d.

### The First Interview Between Defendant and Petillo

As was customary in such cases, defendant took the prisoner Petillo from his cell to an office used by members of the detective bureau in the course of their investigations and asked Petillo, "What happened the night before?" In answer to this query Petillo stated that two marines refused to leave his cafe at closing time, that he did not have a fight with the marines, that when they refused to leave he went "in the back room and got a rifle and shot it in order to scare them out." Defendant informed Petillo that in the "arrest report" it was stated he struck one of the marines on the head with a chair and fired the rifle directly at them. These accusations Petillo denied. Petillo then stated that after the marines ran out of the cafe there was a knocking at the front door, whereupon his cousin readmitted the marines and another man, who Petillo did not recognize; that shortly thereafter he recognized Officer Anderson of the vice squad, to whom he surrendered his rifle. That he became excited and commenced to abuse one of the police officers. This was followed by a scuffle and the subsequent arrest of Petillo.

At the trial, Petillo testified that following his recital to defendant of what occurred the preceding night, the latter said to him, "This is a tough deal and it looks like the 'big house' for you. I could squash this if I could get to the marines and of course it will take some money. There are four or five

of them have to split on it and it will take about $500.00.''
Petillo testified that to the foregoing statement of the defen-
dant he replied ''Well I don't know. I will have to see my
attorney Girard and tell him and then he will let you know.''
Following his arrest defendant stated in answer to questions
propounded by Deputy Chief of Police Harrison that at his
first interview with Petillo the latter ''. . . asked me if it
wasn't possible to adjust the matter financially. I asked him
what he meant. He stated that he was paying off the vice
squad officers, that he had paid off in the county, that he was
in a sort of quandary in the City due to the fact that he
didn't know who to pay his money to. He said that he had
paid $500 to get his dance hall license renewed through
Captain ——— and Captain ———, and he said I'd be fool-
ish if I didn't see the same light that they had. I told him
that I wouldn't go for anything like that. He said he would
have his lawyer see me; that he had been in other beefs and
they had been reduced to simple assault by greasing the
right party. He informed me that he wouldn't be in jail long,
that he had made arrangements to have himself writted out.''

At his trial defendant testified that Petillo inquired of
him as to the seriousness of the charge and then stated,
''That's bad ain't it?'' and, ''He then asked me what I
thought they would do to him, whether there was some way
he could get it reduced and I said, 'I don't know, that isn't
up for me to say, I will have to take it up with the District
Attorney's office,' and he said, 'Isn't there some way I can
get to Anderson and that other officer, give them a little
money or something and square this beef,' and I asked him
what he meant and he said, 'Well I don't know, I don't know
who has to be fixed on a fix.' But he said, 'Whoever it is,
if you can do it for me, I will let it cost me a ''G.'' ' I said,
'Look fellow, let's you and I get this straight,' I said, 'No
police officer could do anything like that for you if he wanted
to.' I said, 'We can only investigate a case and place it in
the laps of the District Attorney's office and it is up to them
to say what will happen, I am in no position or no other
police officer is in any position to do anything for you.' '' De-
fendant also testified to further statements allegedly made by
Petillo, ''Oh, that has been done before''; that his lawyer
''could fix it up''; that he, Petillo, had theretofore paid
$500 to certain police officials ''to get a dance permit back.''
Following this conversation defendant returned Petillo to his

cell in the University jail where he remained until that afternoon when he was released on bond.

## The Second Interview

The record presents no conflict on the fact that some time after noon on the following day, defendant and his working partner, Officer Perry, visited Petillo in the latter's apartment. The defendant testified that the purpose of this visit was to inquire of Petillo about the bullet holes and the direction in which he had fired the rifle on the preceding Sunday night at his cafe. That Petillo stated he did not know. Prior to this visit the officers had been at Petillo's cafe to make an examination of the kitchen for bullet holes but found none. Arriving at Petillo's apartment the defendant testified that he and his partner, Officer Perry, again inquired of Petillo concerning the events which preceded his arrest, and particularly inquired as to whether Petillo was sure he fired the rifle in the kitchen because they were unable to find any bullet holes therein. That Petillo replied, "I was all excited, I don't know." Defendant further testified that Petillo said, "Is there some way, something I can do to blow this beef down, they have me charged with trying to kill a couple of guys," and he said, "I never tried to kill anybody, I was only trying to get them out of my place, isn't there something we can do to get to Anderson or somebody and pay them a little money or something and get out of this." That as defendant and Officer Perry were leaving the apartment, Petillo "caught hold of me and said he would like to see me a minute," whereupon, according to defendant's testimony, Petillo said, "I must have made your partner sore, I guess maybe I talk too much," and I said, "I don't think you made him any sorer than you made me." And he said, "Look, Skaggs, there is something I wanted to ask you, I wanted to ask you fellows but the other guy got sore," he said, "When I was over in the county running the place I never had any trouble like this, and I want to get lined up with the police," and I said, "What do you mean?" And he said, "If I can pay off the police so they won't come in my place, I'll get along swell," and I said, "How are you going to keep them out of your place?" And he said, "If I could get to the right guy, give him $100 a month to keep out," and he said, "If you can do it for me I will give you $100 a month."

Officer Perry in his testimony corroborated the defendant as to the foregoing conversation of Petillo, except the latter

part which occurred outside his presence and during a few minutes that defendant was alone with Petillo in the apartment. The foregoing testimony of the defendant was in agreement with his statement made to his superior officers at the time of his arrest.

As to this second conversation, Kelly Petillo testified that Officer Perry left the room "after about two minutes." Referring to defendant Skaggs, Petillo testified that "He said had had to go down to see the marines in Santa Ana to fix it up," that "he was going to take care of all these other fellows with this money, and he was going to Santa Ana and then let me know what he finds out about the marines"; that he, Petillo, stated to the defendant that the former's attorney "would contact him"; that the defendant said, "it would cost $500.00 and I said, 'Well I have to see Girard (Petillo's attorney).'"

### The Third Interview

There is no conflict in the evidence that later on the afternoon of the same day, Monday, July 2, the attorney for Kelly Petillo stated that he would like an interview with the investigating officers at Petillo's cafe, pursuant to which request the defendant, Officer Perry, Petillo, and the latter's attorney conferred at the cafe. Concededly, at this meeting there was a discussion of the evidence against Petillo, the latter's attorney contending that the evidence was insufficient to sustain a conviction of any criminal offense and that Petillo's conduct on the night of his arrest amounted only to necessary self-defense. The officers contended on the contrary, that the evidence was sufficient to support a misdemeanor if not a felony charge. After the four men adjourned their conference, the evidence shows that the defendant remained in the cafe with Petillo while the latter's attorney and Officer Perry went out on the sidewalk.

The defendant testified that there was no discussion regarding the payment of money at any time while the four men were together or after Officer Perry and Petillo's attorney went out on the sidewalk. The defendant's testimony as to the absence of any discussion of the payment of money while the four men were together was corroborated by Officer Perry.

Mr. Petillo testified that, while the four men were assembled at his cafe, he, the defendant, insisted "it was a felony and that they could put it through the District Attorney"; that he, Petillo, said, "I don't care what you do, I will fight it, and I don't want to have anything to do with this money

that you want, this $500.00 or fixing it up with the marines.'' Petillo also testified that when the defendant said, ''I can fix it up for $500.00,'' that Petillo's attorney ''told him that it was no deal.'' Petillo also testified that after the conference broke up at the table, the defendant took him back into the rest room of the cafe and there said, ''I am going.to see these marines and I will give you 24 hours, 9:00 o'clock tomorrow night, and I want you to have this deal ready, the money ready. Otherwise, I am going to push the deal.'' That to this statement he replied that he would have to see his attorney and would let the defendant know later. Upon cross-examination Petillo testified that the defendant also said in the rest room, ''I am going down to see the marines and I will give you 24 hours to get this money; otherwise I am going to put it through somewhere.''

As to what took place while the four men were in conversation at the cafe, the testimony of Petillo's attorney utterly fails to corroborate Petillo in any respect with reference to the solicitation or payment of money. When asked at the trial, ''In other words, would it be correct to say that you informed Mr. Skaggs and Mr. Perry that you didn't think it was a good case and there wasn't anything to discuss with them about it?'' the attorney replied, ''That is right.'' Petillo's attorney also testified that when he, the defendant, and Officer Perry were in conversation together on the sidewalk, the attorney said that such discussion ''. . . was again to the effect that the occurrence of Saturday night and the crime being investigated did not in my opinion constitute a good prosecution at all. It was further to the effect that it would be unwise and dangerous for any officer whatsoever to ask for or to receive any bribe from Kelly Petillo.'' But whether this admonition was occasioned because of Petillo's claim that he was paying $500 as a bribe in connection with his efforts to regain his dance permit from the police commission rather than with reference to the charge upon which he was under arrest, is not made to appear from the record.

On the following morning, July 3, about 10 o'clock, after he had visited a deputy in the office of the district attorney, Petillo's attorney called upon Deputy Chief of Police Harrison, Director of Personnel and Training of the Los Angeles Police Department. Upon this occasion the defendant's claimed connection with the Petillo arrest was discussed. On the afternoon of the same day a meeting was held in the office of Petillo's attorney at which, in addition to the attorney,

there were present Deputy Chief Harrison, Assistant Chief Bradley, a police captain and Petillo. After some discussion concerning defendant's connection with the Petillo case, the latter made a telephone call while Deputy Chief Harrison listened on an extension telephone. The call was to the defendant at University Police Station. Deputy Chief Harrison testified that the conversation was as follows: "It was approximately 3:45 P.M. Mr. Petillo asked for Mr. Skaggs, a voice answered and said it was Skaggs speaking, Mr. Petillo identified himself as Kelly Petillo. Mr. Petillo told Sergeant Skaggs that his place was in escrow, he would have the money at approximately 8:00 o'clock that evening and for Mr. Skaggs to be at his place at 9 P.M. Mr. Skagg said, 'tonight?' And Kelly Petillo said, 'Yes.' Mr. Skaggs said, 'I have been down to the Marine Base today, to see the marine and he is on his way down to Los Angeles, or uptown, and you had better stay out of sight, he is coming up for satisfaction.' Mr. Petillo said, 'I just talked to my bartender and he told me the marine was in town.' Mr. Skaggs said, 'I left word with your bartender that the marine was on his way to town.' Mr. Petillo said, 'I will see you at 9 o'clock' and Mr. Skaggs said, 'All right,' that was the extent of the conversation."

Petillo's version of this conversation was, "Well, I told him I just sold my night club and I was going to get a $500.00 deposit around 8:00 o'clock and 'I would like to see you as you wanted' ——no, no, it wasn't that, 'I have got that $500.00 that you wanted, I will have it by 9:00 o'clock,' and he wanted me to meet him at some other night club and I said, 'No, my place because this fellow is coming down here to give me the money,' and he agreed and we met at 9:00 o'clock."

The defendant testified that the conversation was as follows: "Mr. Petillo said, 'Skaggs?' And I said, 'Yes,' he said, 'You know what we have been talking about,' and I said, 'Yes.' And he said, 'I have sold my place;' he said, 'I had them give me some money down,' and he said, 'I want to see you at 9:00 o'clock.' I said, 'I have been down there looking for you to tell you that those marines were in town or were coming to town and I want to keep out of sight because we want no more trouble.' He said, 'Well, you know what we talked about, I want to see you at 9:00 o'clock.' I said, '9:00 o'clock tonight or 9:00 o'clock tomorrow morning?' There was a hesitation on the phone and then he said, '9:00 tonight,' and I said, 'Okay, I will be seeing you.'"

Appellant testified that he had visited the marine base on that morning and there had learned that one of the marines involved in the Saturday night disturbance was on liberty. This marine had informed people at the base that he intended to come into Los Angeles and get satisfaction from Kelly Petillo. However, appellant had not seen the marine personally. After returning to the city, appellant went to Petillo's night club, then to Petillo's apartment, and not finding Petillo at either place, returned to the night club and told the bartender that the marine was coming into town and for Kelly Petillo to stay out of sight.

That night after 8 o'clock, Deputy Chief Harrison provided $500 in $20 bills to Police Officer Brown. The treasury numbers were taken off the bills by Chief Harrison. Then Officer Brown went into the night club while Deputy Chief Harrison and other officers waited in police cars in the vicinity. Officer Brown gave Kelly Petillo the $500 and then Brown concealed himself in a storeroom at the head of a stairway above the rest rooms where he could observe what occurred in the hallway leading to the rest rooms.

At three minutes to nine the appellant appeared alone driving a city police car. He drove up a side street off Pico Street and parked as the first car in line. While he was under observation by the officers, he walked from the car to the night club. Officer Brown, waiting up on the platform above the rest rooms, saw appellant come in with Kelly Petillo and saw Mr. Petillo hand the money to the appellant. He overheard Kelly Petillo say: "Now will this take care of the captain, the district attorney and everybody?" and he heard the appellant say: "Yes, you don't have to worry about a thing."

Appellant was observed by the waiting officers coming out of the night club with Kelly Petillo. When Mr. Petillo lighted a cigarette the waiting officers came up and arrested appellant just before he started to drive away. Appellant had the money in his hand at the time of arrest and the numbers on the bills checked with the record kept by Deputy Chief Harrison.

On the way to the station appellant was asked by the officers why he had taken the money and replied that he did not know. He was also asked if he had been directed to take it by Captain Maxwell (a superior officer), and he stated that he had not.

In the statement given by appellant at the police station he was asked to relate the conversation he had with Kelly

Petillo at the time he was given the money. Appellant replied that he did not care to state it, he said the principal conversation was relative to the marine (Lunsford) in the Petillo case but that the receiving of the money had nothing to do with that.

Appellant, in his own defense, testified at the trial to his conversation with Kelly Petillo, at the time he received the money, as follows: ''Mr. Petillo then took a purse from his rear pants pocket and he opened it up. He extracted some bills, a handful of $20.00 bills. He handed them to me and he said, 'You better count them because' he may be $20.00 short. At that time he reached in his pants pocket and he pulled out a $20.00 bill and some smaller bills and some cash. I counted those bills. I said, 'You may be because I only counted $480.00,' he said, 'Count them again.' I counted them five at a time, one, two, three, four, five, a hundred, one, two, three, four, five, a hundred. While doing this Mr. Petillo said, 'That's right, count it that way.' After I had counted the bills, I folded them in the center, I held them in my right hand. Mr. Petillo said, 'Will that take care of the two captains, officer Anderson, the D. A., and everybody?' And I said, 'Yes, I will take care of everything for you.' And I said, 'Your troubles is all over for the time being.' Mr. Petillo said to me the second time, he said, 'Will that take care of Mr. Anderson, the two captains, the D. A., and your partner and yourself and everybody?' And I said, 'It will take care of everybody, you don't need to worry.' And I told Mr. Petillo, or Mr. Petillo spoke to me, rather, and said that everything was working out swell, that he was getting rid of his place, that now he had blown the beer(f) down and he wouldn't have nothing else to worry about. I said, 'That's right.' I walked through the bar accompanied with Mr. Petillo with the money held in my right hand, Mr. Petillo walked as far as the front door, he turned around and I thought he had re-entered the place.''

At the trial defendant testified that on the night he received the $500 from Petillo it was his intention ''to make a case against Mr. Petillo.'' In this regard defendant testified that at University Police Station, prior to his departure therefrom to meet Petillo, he told Sergeant Brunty ''that I had a telephone conversation that day that led me to believe Mr. Petillo wanted to make a payoff to me and I had my mind made up that I was going to do something about it if he ever made me another offer and I would like to have him go with me, and Sergeant Brunty said, 'I heard you tell Sergeant

Goodman after you received that call that you thought Mr. Petillo was trying to buy you or something to that effect,' Sergeant Brunty asked me why I was interested in making a pinch on a bribery, and I said, 'Ordinarily I would not be interested but never in my life have I been approached like I have in this instance.' I told him that Mr. Petillo had either tried to bribe or beat up most every policeman in town, and I thought it was time that somebody taught the gentleman a lesson.'' That Sergeant Brunty informed him it would be necessary to see Lieutenant Bowers and if he ''O.K'd'' it that Brunty would be glad to go with him. Accompanied by Sergeant Brunty, the defendant did see Lieutenant Bowers, whereupon the defendant stated that he and Officer Perry were working on the Petillo case, ''that all through the case Kelly (Petillo) had talked of buying us off and had made flagrant statements to the effect that he had paid $500 to the police for a dance permit; that the vice squad was trying to buy off; that I had made up my mind to do something about it and that after I had talked to Kelly Petillo in the presence of an attorney I didn't think that Kelly Petillo would make another offer because I was of the opinion that his attorney would probably straighten him out; but he had given me that telephone call that afternoon stating that he wanted to see me; and he couldn't tell me over the phone. He said he had some money, and I was of the opinion that the man wanted to make a payoff, and I said I would like very much to go down there and see what the deal is all about, Lieutenant Bowers said that Sergeant Brunty that night consisted of the entire night watch. The other officers were vacationing or days off or what have you. He said, 'I am stuck with the office and I will need Sergeant Brunty for the emergency calls,' he said, 'Why don't you do this, Skaggs, you go down there and see what you can do and see what the lay of the land is and if you need any help why you call the station and I will give you help. You call in and we will see that somebody assists you.' ''

The foregoing testimony of the appellant was corroborated in every detail by Sergeant Brunty and Lieutenant Bowers. Sergeant Brunty testified that the defendant among other things said to him, ''I am supposed to see him (Petillo) tonight and I think he is going to try to give me some money and will you go down and help me on the case?'' In his corroborative testimony, Lieutenant Bowers testified that the defendant

specifically asked that Sergeant Brunty be sent with him and that the witness, after advising the defendant, "they were awful short tonight for men," told the defendant to "go down there first and see what it is all about and then if you need help I will get you some help. If you take anybody with you that he (Petillo) doesn't know and if there is a deal on or set up, why he will be scared off.". It should here be noted that defendant's working partner was not on duty that day because he had gone to the mountains on a fishing trip.

Respondent directs our attention to the fact that when, shortly after his arrest, the defendant was asked in a statement taken from him at police headquarters, to tell what was said between himself and Petillo in the back room when he received the $500, defendant replied, "I don't care to state at this time." At the trial, however, appellant testified that the aforesaid answer was prompted by the fact that "At that time it was going through my mind something had gone wrong, I didn't know what. I am sorry to say it now, but at that time I was afraid that my officers had—that my officers at my own station was in on the deal, the frame-up, because after the telephone call had been received by me, Captain Maxwell wasn't to be found in the station and later I had been permitted to go on the case alone and until such time as I could find out for myself for a certainty whether these officers had anything to do with it, I didn't wish to repeat a conversation that I knew had been previously arranged for the sole purpose of proving me guilty of bribery." There is also testimony in the record that the defendant told other friends of his that Petillo had offered him a bribe and that he proposed to obtain sufficient evidence and prosecute Petillo for bribery.

As a first ground of appeal, it is contended by appellant that the verdict is contrary to the law and the evidence in that the testimony of Petillo, the complaining witness, is incredible, inherently unbelievable and has no substantial corroboration. While it is not clearly ascertainable from the nature of his argument, and from the authorities cited in appellant's opening brief, whether he is urging that Petillo was an accomplice, we shall assume that such is not appellant's claim, for such a contention would be devoid of merit. ▮ A person from whom a bribe is solicited and who refuses to give it certainly cannot be classified as an accomplice. In order to be an accomplice a person must be a criminal. ▮ Where, as here, there is evidence which, if believed, would support a finding

that Petillo refused to give appellant the solicited bribe and arranged with the police to aid in apprehending the appellant while the latter was accepting money furnished by the police for that purpose, Petillo cannot be viewed in the light of anything but a feigned accomplice. Furthermore, there is nothing in the language of section 68 of the Penal Code, for a violation of which appellant was convicted, that manifests any intention to include the victim as an offender. The crime is complete when the individual referred to in the section "asks, receives, or agrees to receive, any bribe." Under some situations, it is conceivable that under the provisions of sections 67 or 68 of the Penal Code the bribe seeker could be the accomplice of the bribe giver, but the evidence in the instant case if believed, presents no such problem, for when appellant sought the bribe, if he did, the crime was complete. It must therefore be held that Kelly Petillo was not an accomplice (*People* v. *Brigham,* 72 Cal.App.2d 1, 6, 7 [163 P.2d 891]).

We shall therefore assume appellant's first contention to be that the testimony of Petillo is so incredible and inherently unbelievable that the law in its "solicitation for the protection of the citizen watches with scrutiny" (*People* v. *Kempley,* 205 Cal. 441, 454 [271 P. 478]) Petillo's testimony. And that unless his testimony which supports the ultimate issue involved is corroborated by other evidence which tends to connect the appellant with the commission of the offense the conviction cannot stand. The record herein forbids denial of the fact that, at the trial, the profligate, unmoral, and more or less dissolute character of the witness Petillo was established. A course of personal conduct was shown upon his part that was not consistent with good morals. It was shown that he had been arrested on a charge of serving a minor with intoxicating liquor, a case which was settled out of court, or as one witness stated, the case was "clammed up." It was testified that Petillo on one occasion struck a police officer "in the eye, when I had glasses on and broke the glasses and a piece went into my eye. . . ." Petillo admitted assaulting Officer Anderson on the night of July 1, when the latter was investigating Petillo's altercation with the marines. He admitted assaulting a traffic officer when the latter attempted to give him a traffic citation and also that he attacked a motorcycle officer who arrested him for speeding. That in the latter case he compromised for $300 a civil suit instituted against him by the

last-named officer. It was shown at the trial that Petillo had boasted of having "fixed" his difficulties with the law and that he had paid $500 to certain officials "to get this dance hall permit." Seven witnesses testified that Petillo's reputation for truth, honesty and integrity was bad. It was established that Petillo possessed a deep-seated and abiding hatred for police officers. With reference to Petillo's testimony, the attorney general with commendable candor concedes that "much of his testimony shows that he was unable to relate a conversation fully or to relate events in chronological order at all times." To this we might add that the record reflects that every conversation to which he testified where other people were present, Petillo's version of such conversation was contradicted by the others, particularly in respect to those portions of such conversation which might tend to incriminate appellant. The attorney general also states that, "It may be conceded that he had had former troubles with the police and it may even be conceded that he had some animosity toward some police officers." Respondent, however, contends that taken as a whole, Petillo's testimony is consistent with the described events as they occurred. That, for instance, Petillo testified that appellant stated he would go down to the marine base, see the marines and "take care of them with money and that he would let Petillo know." The record, however, reflects that the trip to the marine base was made at the direction of the appellant's superior officer for the purpose of ascertaining the availability of the marines as witnesses in the prosecution of Petillo. Respondent also asserts that upon his return from the marine base appellant did call upon Petillo. That Petillo testified he told appellant he was trying to sell his business to raise money. That when he called appellant while a deputy chief of police listened on the extension telephone, Petillo told appellant he had sold his business, would have the money at 8 o'clock, and requested appellant to meet him at 9 o'clock. That appellant came at the appointed hour, received the money according to plan, and made statements as heretofore set forth which corroborated Petillo's testimony that the appellant solicited a bribe and accepted the $500 in consummation of his agreement to "fix" the case against Petillo.

The law is well settled that it is not within the province of an appellate tribunal to retry the case or to make inferences from the facts proved. That function belongs to the trial court. The appellate court is limited to deciding only whether

upon the face of the evidence, and that means the evidence in its entirety, it can justly be held that sufficient facts could not have been found in the evidence in its entirety to warrant the inference of guilt (*People* v. *Newland,* 15 Cal.2d 678 [104 P.2d 778]). In such a situation it is obviously not a review of a question of fact but purely one of law. The Legislature has ordained, in conformity with our Constitution, which prohibits appellate courts from reviewing evidence except where on its face it may justly be held that it is insufficient to support the ultimate issue involved, that the jury are the exclusive judges of the credibility of witnesses (Code Civ. Proc., § 1847) and are the judges of the *effect* and *value* of evidence addressed to them, except in those instances where it is declared by the law that it shall be conclusive proof of the fact to which it relates (Code Civ. Proc., § 2061).

Notwithstanding the profligate character of Petillo, his proven animosity and ill will toward police officers, and his possible motives for fabricating his testimony, nevertheless, under the foregoing established rules, the jury in this case were authorized, if they conscientiously felt warranted in so doing, after full and fair consideration thereof, to reject any testimony which might have been contradictory to that given by witnesses for the prosecution and, therefore, to disbelieve the testimony of the appellant and any other witnesses testifying in his behalf, however weak in places the testimony of the prosecution witnesses may have been made to appear, or however sharply their testimony on other important points might have conflicted with the testimony of the other witnesses. Viewed in the light of the circumstances hereinbefore referred to which might have been regarded by the jury as corroborative of Petillo's testimony, we cannot see how it can be held, as a matter of law, that the latter's testimony, insofar as it concerns the ultimate issue involved, is not true, or is improbable upon its face. In *People* v. *Haydon,* 18 Cal.App. 543, 555 [123 P. 1102, 1114], it is said: "A statement, to bear upon its face the brand of improbability, or which may be said to be unbelievable, *per se,* must involve, we think, a claim that something has been done that it would not seem possible could be done under the circumstances described, or involve conduct that no one but a person of a seriously calentured mentality would be likely to do." In view of the facts and circumstances established by testimony other than that given by

Petillo, particularly as to the immediate circumstances of the passing of the money to appellant, it cannot be justly said that Petillo's testimony should be strictured as improbable or inherently unbelievable. And not being an accomplice, the jury was not required to weigh Petillo's testimony in the light of corroborative evidence.

It is next contended by appellant that there is ample evidence to show that he feigned complicity in a bribe agreement, accepted the $500 and permitted Petillo to believe that he intended to use the money to protect him from the impending prosecution for his alleged assault upon the marines, all for the sole purpose of securing evidence upon which to prosecute Petillo for offering and giving a bribe (Pen. Code, § 67). The record reflects that such was the whole defense theory at the trial, and as stated by respondent, "If appellant was pretending to accept a bribe then he is of course not guilty." It is unnecessary to here set forth the evidence offered in support of this theory, as we have hereinbefore narrated it in detail. Suffice it to now state that it was established at the trial that prior to keeping his appointment with Petillo to receive the money, appellant informed no less than three other police officers that he thought Petillo "was giving me a play for a pay off." That appellant said to Sergeant Brunty, "I am supposed to see him tonight. I think he is going to try to give me some money and will you go down and help me on the case?" Officer Brunty agreed if the night lieutenant at University Station approved. Both Officer Brunty and appellant sought out night Lieutenant Bowers and appellant asked his superior officer to send Brunty with him but the lieutenant stated that they "were awful short tonight for men" and told appellant to "go down there first and see what it is all about and then if you need help I will get you some help. If you take anybody with you that he doesn't know and if there is a deal on or setup why, he will be scared off." This and other testimony hereinbefore set forth and fully corroborated by Lieutenant Bowers, Sergeant Brunty and Officer Goodman is certainly at variance with the propensities and conduct of an officer who was wilfully and unlawfully about to accept a bribe. Bribe takers are not prone to ask for witnesses to their perfidy. True, the verity of this defense was a matter for the jury's determination and the verdict rendered would indicate that they rejected it. But appellant was entitled to have his defense presented to the jury under proper instructions. Ap-

pellant's defense was a vital issue in the case. The proven unmoral reputation of Petillo, his animosity toward police officers, the long and honorable record of appellant as a police officer and his conduct prior to his acceptance of the money, all impress us with the necessity for scrutinizing the instructions given to the jury to ascertain whether those now challenged by appellant operated to prejudice his substantial rights and militated against his receiving that fair and impartial trial guaranteed by law to every person accused of crime.

▮ By the first instructions under attack the jury was admonished that, "You are instructed that whether or not defendant Skaggs *actually intended* to have his actions influenced by any money that he received, if you believe that he did receive any, *is immaterial,* if you believe from the evience and beyond a reasonable doubt that the said Skaggs did receive said money and that he represented that he would be influenced by the receipt of such money." (Emphasis added.)

By this instruction the jury was told that it mattered not whether appellant received the money with the intention to be influenced thereby or in furtherance of his plan to apprehend Petillo for offering and giving a bribe; that his guilt depended solely upon his representations to Petillo that he would be influenced by the receipt of the money.

Again, the jury was advised that, "You are instructed that whether or not defendant Skaggs actually *intended* to have *his actions influenced* by any money that he received, if you believe that he did receive any, *is immaterial,* if you believe from the evidence and beyond a reasonable doubt that the said Skaggs did receive said money and that he represented that he would be influenced by the receipt of such money." (Emphasis added.)

Both of the foregoing instructions excluded from the jury's consideration the whole defense offered by the appellant. In the absence of any instructions advising the jury of the law applicable to appellant's defense, the giving of the above instructions must be held to be erroneous. That the error was prejudicial is manifest. In view of the grave hazards of possible injustice being done to appellant by the challenged instructions, it must be held that the giving of the same under the facts of this case was serious prejudicial error. If proper instructions had been given, the testimony of appellant and

other witnesses who corroborated him, if believed by the jury, would have prevented his conviction.

■ While appellant did not request instructions on the law applicable to his defense, nevertheless, under the circumstances which the instant case presents, the failure of the trial court to instruct the jury thereon was prejudicial error, because the aforesaid instructions as given were manifestly incorrect for the reason that they excluded from the jury's consideration a very vital issue raised by the evidence. As was said by this court in *People* v. *Heddens,* 12 Cal.App.2d 245, 247 [55 P.2d 230]: "It is the duty of the court in criminal cases to give of its own motion instructions on the general principles of law pertinent to such cases, even though they are not proposed or presented in writing by the parties themselves." (Citing cases.)

With the record in the condition in which we find it, we must look into the effect of the error of the trial court in connection with the disposition of this appeal in the light of the provisions of section 4½ of article VI of our state Constitution, which forbids us to set aside any judgment or grant a new trial unless, after an examination of the entire cause, including the evidence, this court shall be of the opinion that the error complained of has resulted in a miscarriage of justice. The phrase "miscarriage of justice," used as descriptive of that condition of a cause, has no hard and fast definition. As was stated by this court in *People* v. *Gilliland,* 39 Cal.App. 2d 250, 264 [103 P.2d 179], "We do not understand section 4½ of article VI of the Constitution as intended to mean that merely because the evidence may legally be able to stand up under the weight of the judgment, that is sufficient reason in all cases for refusing to set aside the judgment. (*People* v. *Davis,* 210 Cal. 540, 556 [293 P. 32].)" The following language used by this court in *People* v. *Duvernay,* 43 Cal.App. 2d 823, 829 [111 P.2d 659], is strikingly pertinent to the situation with which we are here confronted: "There is creditable authority for the statement that the phrase 'miscarriage of justice,' as used in the constitutional provision, 'does not merely mean that a guilty man has escaped or that an innocent man has been convicted. It is equally applicable to cases where the acquittal or conviction has resulted from some form of trial in which the essential rights of the people or of the defendant were disregarded or denied. The right of the accused, in a given case, to a fair trial, conducted substantially according to law, is at the same time the right of all

inhabitants of the country to protection against procedure which might at some time deprive them of life or liberty. "It is an essential part of justice that the question of guilt or innocence shall be determined by an orderly legal procedure in which the substantial rights belonging to the defendant shall be respected." ' (*People* v. *Wilson,* 23 Cal.App. 513 [138 P. 971].) In the instant case we do not regard the evidence as sufficient to put into operation the provisions of section 4½ of article VI of the Constitution, because even convincing proof of a defendant's guilt does not necessarily mean, under all circumstances, that there has been no miscarriage of justice. (*People* v. *Mahoney,* 201 Cal. 618 [258 P. 607]; *People* v. *Patubo,* 9 Cal.2d 537 [71 P.2d 270, 113 A.L.R. 1303).) When a defendant is denied that fair and impartial trial guaranteed by law, such procedure amounts to a denial of due process of law. (*Powell* v. *Alabama,* 287 U.S. 45 [53 Sup.Ct. 55, 77 L.Ed. 158, 84 A.L.R. 527].)"

In the case before us the evidence as to many material facts is in sharp conflict. True, the jury had an opportunity to observe the demeanor of the witnesses, the manner in which they testified, their degree of intelligence, and may have had reason to return the verdict which was found irrespective of the errors committed during the trial. As to this we can of course say nothing. But from a reading of the record we are persuaded the errors may have turned the scale in favor of the prosecution. Being unable to say "whether appellant would or would not have been convicted but for the errors of the court" (*People* v. *Black,* 73 Cal.App. 13, 38 [238 P. 374]), we must direct a reversal.

By reason of the foregoing it becomes unnecessary to consider or determine other questions raised on this appeal.

The judgment and the order denying the defendant's motion for a new trial are, and each of them is, reversed, and the cause remanded for a new trial.

York, P. J., and Doran, J., concurred.