[Crim. No. 4427. Second Dist., Div. Two. July 24, 1950.]

THE PEOPLE, Respondent, v. CHARLES S. FINKELSTIN, Appellant.

Morris Lavine for Appellant.

Fred N. Howser, Attorney General, and William E. James, Deputy Attorney General, for Respondent.

MOORE, P. J.—Appeal from a conviction of bribery. Since appellant demands a reversal on the ground that he was the victim of an entrapment, a detailed statement of the evidence is essential to a full understanding of all contentions.

At the time of the occurrences mentioned herein appellant was a citizen of Oxnard where he had resided for 10 years and had operated a pawnshop. William P. Clark was the chief of police of that city; Alfred Jewell was sergeant of police and Edward L. Stanton was a police detective. On June 30, 1949, appellant inquired of Stanton concerning one Macius who had been arrested on that day for an illegal sale of fireworks and promised the officer to make it worth his while if the latter would ''get the boy out and get the fireworks back.'' July 2 the fireworks were returned to appellant when Stanton called to check the pawnshop books. While Stanton was in pursuit of such task, appellant walked by, inserted his hand in the detective's coat pocket, saying, ''thanks.'' When Stanton protested that he did not ''want that,'' the reply was, ''Oh, take it, there is more where that came from.'' The gift was two 10-dollar bills which Stanton initialed, enclosed in an envelope and gave to the chief. While the detective was in the pawnshop on July 4 appellant asked him whether he had any idea how much money might be made in Oxnard if the police department would ''play ball.'' On receiving a negative answer appellant said, ''About $4,000 for the chief, and he doesn't have to share that with anyone . . . We could open four houses in Oxnard.'' These, said appellant, would pay $500 apiece; could run ''with very little pressure, because 13 or 15 houses ran there in the old days.'' Also, appellant said he would pay $750 a month to run a crap game and there were other angles where money could be made. When in answer to appellant's inquiry as to how the chief would regard the opening of such houses, the detective said he had no idea. Thereupon the shopkeeper said, ''Feel him out . . . There is lots of money to be made and we are losing money by losing time.''

On July 5 the officer was again at the pawnshop. When appellant asked whether he had felt out the chief about opening up the town, Stanton stated that he had made some mention of the matter to his superior but was very doubtful whether he would allow houses of prostitution and as to the crap game he did not believe the chief would let his reputation go for $750 a month. ''Well,'' said appellant, ''I can raise that ante to a thousand with the extra bonus when I have a

good month and am making money. He is to have some of it too.'' Appellant then expanded upon his plan to be willing to suffer an arrest occasionally to make it appear that the police department was performing its duty. ''Just . . . take me out; I won't mind . . . I will go over and pay a small fine; it is all a part of the overhead.'' He knew he would not get a jail sentence; he could take care of the judge.

When Stanton called at appellant's home on July 6, appellant was eager to discuss matters with the chief to make final arrangements on the game inasmuch as he desired to go to New York to make arrangements for first class crap game handlers. Also, he said he had connections with a syndicate which would supply prostitutes for his houses to be opened in Oxnard; he had made a lot of money in the great metropolis where he had paid off all the officers; everybody got a little bit from $2.00 a day for the patrolman who walked the beat to $10 a day for the sergeant and everybody was happy; if the police had let him alone he could have made $10,000 on fireworks; he had made some money but not much because of police pressure; when Oxnard was running open all policemen ate steaks, but apparently not now. At appellant's request the officer drove him to the pawnshop where he was taken to the rear to see a supply of punchboards valued at $8,000 which appellant had purchased and which would justify a tidy pay-off if allowed to operate.

When Stanton was at the pawnshop on July 7 appellant asked him for permission to install a punchboard in a specified café, and Stanton told him he would have to see the chief. In a conversation later on the same day Stanton told appellant that Chief Clark had refused to assent to the installation of punchboards. It was at that time appellant telephoned to Judge Nelson at the city hall as follows: ''Hello, this is Charley; I would like to see you on some business; Okay, I will see you then.'' He then told the detective that he would make more definite arrangements with the judge since Stanton seemed to be worried about it and then would advise the latter of the outcome.

When on July 11 Sergeant Jewell accompanied Stanton to the pawnshop, appellant approached the automobile of the officers and in referring to a visit of Jewell to Nevada said to the sergeant, ''Why didn't you wire me for some money if you needed some; you should have taken my Cadillac to start with to make the trip.'' Stanton told appellant it was all right to

speak in front of Jewell. After the officers had been invited into the pawnshop, appellant, addressing the sergeant said, "Now that you are back we ought to get going because we are losing money by losing time; the business men of Oxnard would like to see the town opened up; I am not worried about anybody but Bill Clark and Whitey [Stanton] is working on him." In answer to Jewell's inquiry appellant said there was $5,000 a month to be made for the police department. As to City Manager Shannon, Judge Nelson would take care of him all right. "I would like to talk with the Chief so we can make some final arrangements."

Thereafter on the same day Stanton arranged with the chief to meet appellant and advised the latter that they would meet him about 9 o'clock p. m. After the two officers had called for appellant, they drove to the home of the chief. After the latter had seated himself beside Jewell, they cruised about the city. As they proceeded Clark said to appellant, "Charlie, I understand you have something on your mind you would like to talk to me about." Appellant replied, "Well, I am ready to go," and when asked for his meaning, continued, "This is the way I believe it should be, that we start out easy by opening one house of prostitution and I am ready to lay $500 on the line for that opening. . . . The Juanita will be the first one to open and we can put the five hundred on the line right now." When the chief replied that he would not open up for $500, appellant stated, "Well, I can make it more." Chief Clark answered, "Give me some exact figure," to which appellant replied, "Well, there are three more houses at five hundred a piece, which will make it two thousand. My crap game should start in a week or ten days. It will take a little time to make arrangements and get handlers, but that will pay a thousand. There are the carnivals when they come to town will make extra money and the punchboards and burlesque shows." To Clark's inquiry as to what all this would amount to for him, appellant's reply was, "About five thousand a month when we get going." When the chief stated, "I don't think we can talk any business; I am not interested in your $500 proposition" appellant said, "Maybe I can put $3,000 on the line but I will have to have some time to think it over." After Clark replied, "I don't think we can do any business," he directed Jewell to deposit their guest at his place. Later the same evening Stanton and Jewell met appellant as he emerged from the poolroom adjoining his pawnshop; they told him they believed they could not reach an agreement; they were

sorry that the negotiations had started; appellant said, "Well, I am not sorry. I am going to offer three thousand to him. I think the Chief will do business then."

On July 12th appellant by telephone requested Stanton to call at his home. There he told Stanton and Jewell that he was "ready to lay three thousand on the line" and desired another meeting with the chief. They told him to call their superior and make the engagement. That same evening there was a meeting in Chief Clark's office. The sergeant and the detective were both there accompanied by Jack Anderson, the desk operator. Ernest Arnold, a court reporter was in the closet of Clark's office as appellant entered. After waiting about 15 minutes appellant said, "See you later" and departed. On July 13 in compliance with a message from appellant to Stanton the latter and Sergeant Jewell called at the pawnshop. Appellant said, "I have the money; where can I locate the Chief?" Pursuant to Stanton's suggestion, he talked with Clark after which he announced, "I have a meeting with him in ten minutes." The two officers proceeded at once to the office of the chief where they found him and Captain Hinostro who was concealed in the locker. As appellant entered he said, "I have got it,—three Gees." Addressing him the chief said, "Charlie, so that we understand each other, what is that for?" "That," said the pawnbroker, "is for the houses and my crap game we talked about." Thereupon Chief Clark took the money and said, "Well, Charlie, you play your game and I will play mine. You are under arrest for bribery." Stanton then enclosed the thirty $100 bills which were introduced at the trial along with the two 10-dollar bills given to him on July 2.

The foregoing recitals are a synopsis of the testimony of Officer Stanton. It was corroborated in all essentials by Clark, Jewell and Hinostro. In addition, Judge Nelson testified that on July 7 appellant called him by telephone for an appointment. He was called again the following day after which, accompanied by Henry Blatt, he paid a visit to the pawnshop. Appellant then told him they were arranging to open up the town and wished to know how the judge felt about it. The latter's reply was that appellant could not have a deal like that without the cooperation of the chief of police. On July 12 appellant telephoned the judge again asking for an interview on something important. Accompanied by Bob Nelson, the judge drove again to the pawnshop. On entering he was

informed by appellant that they were going to open the town. When he asked appellant if the chief was a party to the deal, appellant said, ''The chief needs money. He is ready to go along.'' The judge then asked what appellant would do with Mr. Shannon, the city manager. Appellant's reply was that Mayor Carty will take care of him. The judge told him that he would cooperate with the chief.

Cashier Hanson of the Levy Bank testified that appellant had had him cash a check at about 11 o'clock a. m. for $3,000 and requested thirty $100 bills.

### APPELLANT WAS NOT ENTRAPPED

Appellant wholly misconceives the doctrine of entrapment. He asserts that the conduct of the officers was against public policy in that they led him on to unfold his plans and to increase the amount of his offer for protection against laws that inhibit gambling and prostitution and actually to pay the money. On the contrary such behavior was designed to uphold the public policy of the state as expressed in its statutes and court decisions. Had the officers gone in search of a bribe giver, placed decoys to attract corruptionists and led the tempted one to commit the final act, they would thereby have lowered the standards of honorable and decent official conduct, would have violated the ethics of good citizenship and would have lost the prey they aimed to conquer. But they did no such thing. Appellant conceived the crime in his own brain, opened the negotiations without the slightest inducement and took the initiative at every meeting. To seduce the constabulary of his adopted city was with him a passion. To effect the nullification of laws and ordinances against the most loathsome social vices was the prelude to the realization of his dream of vast riches. He set about the achievement of his purpose without hesitancy or timidity. He seized an opportunity when he had been graciously served by a subordinate official and undertook to penetrate the latter's moral epidermis by a gift of $20. Stirred by the knowledge that his largess reposed in a pocket of the amiable detective he lost no time in proposing his plan for enriching the police if they would only ''play ball.'' Four thousand a month for the chief for his very own! This was a definite offer to one he deemed an agent for the head of the police department. Nor did he pause to await developments: ''Feel him out; there is lots of money to be made and we are losing money by losing time.'' At his next meeting with the same officer he was the first to raise the sub-

ject for discussion and when it was suggested that $750 monthly for a protected crap game was too little for a stain upon the chief's reputation he promptly countered with an offer of $1,000 per month with an extra bonus for every "good month" and proposed that he should pay a fine occasionally. He knew he would not be jailed, he "could take care of the judge." They met again, this time with the sergeant present. Increased boldness seized the impresario. With the sergeant back, "we ought to get going . . . I would like to talk with the chief so we can make some final arrangements." After a bribegiver has told a patrolman the amount he will pay to the head of the police department and asks for the privilege of communicating directly with the chief it would be injurious to the public welfare for either official to "fade out," leaving the rascal at large. To meet with him and obtain indisputable evidence of his offer was a duty the chief owed the State. That he did so is a stimulus to honesty in public service and an unforgettable lesson to lurking corruptionists.

Entrapment exists only where the official has conceived and planned the crime for one who would not have done it but for the allurement, deception or persuasion of the officer. (*People* v. *Makovsky,* 3 Cal.2d 366, 369 [44 P.2d 536] ; *People* v. *Lindsey,* 91 Cal.App.2d 914, 916 [205 P.2d 1114].) If the doing of an act is a crime and the criminal intent originated in the mind of the accused and the offense is completed, the fact that an officer appeared to cooperate by furnishing opportunity or otherwise aiding the offender in order to facilitate the consummation of the act is not a defense. (*People* v. *Cherry,* 39 Cal. App.2d 149, 151-154 [102 P.2d 546] ; *In re Moore,* 70 Cal. App. 483, 488 [233 P. 805] ; *United States* v. *Wray,* 8 F.2d 429, 430.) When police officers are informed that a person intends to offer a bribe to an official of the state they may afford opportunities for him to negotiate, to bargain and pay the money and may act with the offender, and if after originating the criminal intent, he takes such steps as are necessary to complete the offense he is nonetheless guilty of the crime because the officers had encouraged him to divulge his plans and to enlarge his offers and were present at the final scene. (See *People* v. *Grijalva,* 48 Cal.App.2d 690, 694 [121 P.2d 32] ; *People* v. *Hall,* 133 Cal.App. 40, 45 [23 P.2d 783] ; *People* v. *Caiazza,* 61 Cal.App. 505, 507 [215 P. 80].) One who commits a crime induced thereto by an officer can escape punishment only when the criminal intent was first conceived

by the minions of the law, and it is a question of fact whether they were the authors of the criminal scheme or merely encouraged his boldness. (See *People* v. *Lagomarsino,* 97 Cal. App.2d 92, 97 [217 P.2d 124]; *People* v. *Grosofsky,* 73 Cal.App.2d 15, 18 [165 P.2d 757]; *People* v. *Malone,* 117 Cal.App. 629, 633 [4 P.2d 287].)

Appellant emphasizes the holding of *People* v. *Werner,* 16 Cal.2d 216 [105 P.2d 927]. It is not pertinent. The court made it clear (p. 225) that when the complaining witness concluded that the defendants were not sincere or honest in their motives, for the purpose of securing their conviction he went "far beyond the passive assistance that is permitted under the authorities to apprehend a potential offender, going to the extent of actively delivering or handing over his property . . . thereby depriving the offense, if any, of the essential element of lack of consent of the owner.''

█ Under section 67 of the Penal Code* every person who merely offers a bribe to an executive officer with intent to influence his decision is guilty. (*People* v. *Skaggs,* 80 Cal. App.2d 83, 94 [181 P.2d 390]; *People* v. *Brigham,* 72 Cal. App.2d 1, 6 [163 P.2d 891].) The law punishes an offer which is calculated to debase (*People* v. *Ah Fook,* 62 Cal. 493, 495) as well as the actual delivery of the thing of value to the official. Hence, appellant violated the statute when he first met Chief Clark and proposed the payment of sums of money if the latter would desist from enforcing the laws against prostitution and gambling. █ Was he entrapped to make that offer and to particularize the procedure by which brothels would be opened and his crap game started? Was he entrapped to chide Sergeant Jewell for not wiring him from Nevada for money? Was he entrapped to tell Stanton on July 2 that if the police would "play ball,'' $4,000 a month could be made for the chief, that each bawdy house could pay $500 monthly and his crap game $750? Verily, was he entrapped when he put $20 into Stanton's pocket? The chief exercised only the cunning of a law enforcement agent when he commenced a campaign to ascertain whether others were directing the movements of appellant. It was his apparent purpose not only to bring the pawnbroker to justice but to apprehend

---

*Every person who gives or offers any bribe to any executive officer of this state, with intent to influence him in respect to any act, decision, vote, opinion, or other proceeding as such officer is punishable by imprisonment in the state prison not less than one nor more than fourteen years, and is disqualified from holding any office in this state.''

such as might have been in league with him in his vicious enterprise. To achieve that purpose he was justified in resorting to reasonable stratagems. (*People* v. *Seely,* 66 Cal.App.2d 408, 412 [152 P.2d 454].) His remaining passive and not attempting to prevent the crime (*People* v. *Werner, supra,* 216) encouraged appellant to request the detective to "feel out the chief"; to admonish Stanton and Jewell how they were all losing money by losing time; to boast of his experience in bribing officers in an eastern city; to expose his possession of $8,000 worth of punchboards; to offer Sergeant Jewell the free use of his Cadillac; to tell of his gifts of whiskey to policemen; to tell his offer of a home for Chief Clark—the chief could live for "nothing"; to claim he could control the city's judge, the city manager and the mayor; to declare to Jewell and Stanton that he was not sorry the conversations had started and he was going to offer the $3,000 to the chief. In order to elicit such admissions and to gain such other information of intended crimes and of other criminals as appellant might have possessed, Chief Clark was warranted in having his men cooperate with appellant. (*People* v. *Seely,* 66 Cal. App.2d 408, 412 [152 P.2d 454].)

The attempt to impress this court by presenting such evidence as he deems proof of appellant's innocence is vain. The only concern here is whether under all the evidence appellant could not have been guilty. (*People* v. *Newland,* 15 Cal.2d 678, 681 [104 P.2d 778].) Favorable proof, reasonable inferences and all intendments are invoked in support of the judgment.

In order to protect the accused against undue zeal of the officers and to give him the benefit of his theory of entrapment, the court instructed the jury in the language of California Jury Instructions, Criminal, Instructions 851 and 854* which in effect directed a verdict of not guilty if the officers generated in an innocent mind the original intent to commit the crime

---

*California Jury Instructions, Criminal.

Instruction No. *851*

The law does not tolerate a person, particularly a law enforcement officer, generating in the mind of a person who is innocent of any criminal purpose, the original intent to commit a crime thus entrapping such person into the commission of a crime which he would not have committed or even contemplated but for such inducement; and where a crime is committed as a consequence of such entrapment, no conviction may be had of the person so entrapped as his acts do not constitute a crime.

If the intent to commit the crime did not originate with the defendant and he was not carrying out his own criminal purpose, but

and whether the acts constituting the offense resulted from the defendant's attempt to carry out his own intent. The instructions appear on the margin hereof and the law is given above.

██ The contention that the rule of corroboration as required by Penal Code section 653f was applicable on the trial of appellant is without support. None of the officers who conversed with appellant was his accomplice. Both Stanton and Jewell were feigned accomplices and as such did not require corroboration. (*People* v. *Bolanger*, 71 Cal. 17, 19 [11 P. 799]; *People* v. *Kennedy*, 66 Cal.App.2d 522, 524 [152 P.2d 513].) Since the action is for *giving* a bribe, section 653f is not applicable. Officers Stanton and Jewell were not assisting appellant in originating or in executing his crime. Therefore, their testimony did not require corroboration. (*People* v. *Kennedy*, *supra*; *People* v. *Frazer*, 80 Cal.App. 464, 468 [252 P. 633].)

██ It is contended that at the time of giving the bribe to the chief there was no act, decision, opinion or other proceeding pending before him. That could not be true according to appellant's concession that he paid the $3,000. The offer of payment for the privilege of operating his unlawful enterprises without interference brought at once to the chief's mind the matter of deciding on the proposal. That the payment of money to an officer to allow the briber to operate gambling houses and red-light brothels is bribery is the law of this state. (*People* v. *Megladdery*, 40 Cal.App.2d 748, 782 [106 P.2d 84]; *People* v. *Glass*, 158 Cal. 650, 677 [112 P. 281]; *People* v. *McGee*, 107 Cal.App. 56, 58 [290 P. 61].)

██ When the indictment was returned, it accused appellant of giving a "bribe of Three Thousand Dollars . . . to William P. Clark who was then and there a ministerial officer of the City of Oxnard, to wit: the Chief of Police of the City."

---

the crime was suggested by another person acting with the purpose of entrapping and causing the arrest of the defendant, then the defendant is not criminally liable for the acts so committed.

Instruction No. *854*

It is important in considering the defense of entrapment to ascertain whether the acts charged as constituting the offense were the result of the intent of some other person to place the accused in a position where he might be charged with the offense, in which event the defendant may not be convicted or whether the defendant, acting in pursuance of his own intent, committed the acts, such other person merely affording him the opportunity of doing so, in which latter event the defense of entrapment would not relieve the defendant from responsibility.

On motion the prosecution was allowed to amend the pleading by substituting the word "executive" for the word "ministerial." Because the latter word is used in section 67½ whereas the word executive is used in section 67 of the Penal Code, appellant contends that a different crime is charged from that found by the grand jury and that the court is thereby deprived of jurisdiction. It was to dispose of such inconsequential arguments that the lawmakers reformed the law so as to allow the district attorney to amend an indictment or information. (Pen. Code, § 1008; *People* v. *Suter*, 43 Cal.App.2d 444, 462 [111 P.2d 23]; 14 Cal.Jur., Indictment and Information, pp. 91-93.) No possible prejudice could have been suffered by a change in the description of the bribee. The accused was not surprised and he made no claim of prejudice in the trial court. If the amendment had been an unexpected occurrence it was incumbent upon him then and there to complain to the court which could have granted a continuance or have repaired any detriment suffered.

Because Ordinance 296 of the city of Oxnard establishes the city manager as the chief executive and administrative officer, appellant contends that the chief of police is a ministerial officer. His conclusion does not follow. The ordinance does not declare that there shall be but one executive officer. It has been held that a deputy sheriff (*People* v. *Lips*, 59 Cal.App. 381, 385 [211 P. 22]), a constable (*Manss* v. *Superior Court*, 25 Cal.App. 533, 535 [144 P. 298]), a junior epidemiologist-bacteriologist of the department of public health (*People* v. *Kerns*, 9 Cal.App.2d 72 [48 P.2d 750]), a city marshal (*People* v. *Anderson*, 75 Cal.App. 365, 372 [242 P. 906]) are executive officers. Even though the cited decisions were prior to the amendment of section 68* of the Penal Code, they are persuasive if not decisive of the nature of work performed by a chief of police. Appellant contends that a chief of police in a city of the sixth class is a ministerial officer by reason of the fact that the city manager is in charge of the police and gives orders to the chief. In this he omits from consideration that there is always some authority superior to the chief of police. Because in many cities he is appointed by the mayor or by the police commission he is not on that account made a ministerial officer. The general law

*Section 68, amended in 1933 makes it a felony for an executive or a ministerial officer to receive a bribe on agreement that his action will be influenced thereby.

as well as local ordinances place upon him the responsibility of enforcing the law and of assigning his subordinates to their several tasks. Such labors make of him an executive, whereas if he did only such as might be prescribed by a superior, he would be a ministerial officer.

### No Errors In Rulings on the Admissibility of Evidence

It is contended that the exclusion of evidence "regarding the gambling activities of officer Stanton" was error; that appellant's theory was that Stanton had lost heavily in gambling and was urging the opening of the town in order to recoup his losses. Whether Stanton lost his money on a green table or lost the city's money in his quest of violators of gaming laws is immaterial. His personal behavior in indulging in social vices was in no respect material to the proof of whether appellant gave the chief $3,000 for the purpose of influencing him to open the town.

In the course of appellant's testimony, his counsel offered to prove that appellant approached one Gottlieb, operator of a burlesque show, and told him that the police would let him open his show if he paid $1000 and that Gottlieb replied, "I won't give them ten cents." Appellant contends that the exclusion of such testimony was error; that it was a part of the res gestae. The conversation was hearsay and irrelevant. It was not spoken at the time of the payment of the bribe or at the time of any conversation between appellant and the chief. Only those declarations which form part of the transaction in dispute are res gestae. They must be incidental to and explanatory of the main fact and so closely connected with it as to constitute a part of it and without which the main fact might not be properly understood. (Code Civ. Proc., § 1850; 8 Cal.Jur. pp. 190, 191.) Appellant says it was not offered to prove that the police would let Gottlieb open his show if he paid them $2,000, "but merely to show that such a conversation took place." It could not have been offered for any purpose other than to influence the jury to believe that appellant was led to slaughter by officers who lured him into captivity.

### No Prejudice Resulted From Instructions Given or Refused

There was no error in the instruction that "the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact, except perjury and treason." This is taken from the Code of Civil Procedure, section 1844. It

has not been amended since its adoption in 1872. 

Section 653f, Penal Code, is not pertinent. It relates to a prosecution of a person for soliciting another to offer or accept a bribe and is not referable to section 67.

 Appellant assigns the following instruction as prejudicial error.

"One who, under the direction of an officer of the law or of any other person, or upon his own initiative, and without criminal intent, feigns complicity in the commission of a crime merely for the purpose of detecting the perpetrator thereof, with a view to prosecution for the offense, is not an accomplice in law, and his testimony need not be corroborated. To support a conviction, however, such testimony and all other evidence tending to prove guilt must carry the convincing force required by law."

This instruction is taken from California Jury Instructions, Criminal, No. 825. It states the law as settled by the appellate courts. (*People* v. *Kennedy,* 66 Cal. App.2d 522, 523 [152 P.2d 513] ; *People* v. *Hicks,* 62 Cal.App.2d 859, 862 [145 P.2d 689] ; *People* v. *Bolanger,* 71 Cal. 17, 19 [11 P. 799].)

 Complaint is made that the court did not define accomplices. Such definition was not pertinent. The theory of the defense was entrapment. The testimony of appellant and his cross-examination of the State's witnesses were both outlined to establish such defense. No accomplice was named either as accessory before or after the fact, only feigned accomplices as to whom appropriate instructions were read covering the law of entrapment.

 The court gave an instruction to the effect that in considering the following definitions you should remember that in every public offense "there must exist a union, or joint operation of act and intent or criminal negligence. *The intent is manifested by the circumstances connected with the offense,* and the sound mind and discretion of the accused; but all persons are of sound mind who are neither idiots nor lunatics, nor affected with insanity." Appellant contends that this instruction was prejudicial because it allows the jury to find criminal intent from the circumstances of the offense and cites *People* v. *Snyder,* 15 Cal.2d 706, 709 [104 P.2d 639], in support of such contention. The argument is erroneous and the authority does not apply. The instruction there deemed to be vicious said that "the specific intent essential to the commission of a crime less than homicide may be presumed from the doing of the unlawful act." The criticized instruction

effectually directed the jury *to find the intent as manifested by the circumstances.* It must be read in connection with all the other instructions which the jury are presumed to have understood and obeyed. They were told the significance of the word bribe (California Jury Instructions, Criminal No. 772) and that it is given ''with a corrupt intent to influence unlawfully the person to whom it is given.'' This language in effect directs the jury to ascertain whether the bribe was given with a corrupt intent. Moreover, at appellant's request the jury were instructed that in every public offense ''there must exist a union of joint·operation of act and intent, or criminal negligence.''

The contention that the court refused to give instructions 26 and 33 which treat of reasonable doubt that might be created by defendant's testimony and to apply the same rules as are applied in considering the testimony of other witnesses is unfounded. Approved instructions were given with reference to weighing the testimony of witnesses, reasonable doubt, the insufficiency of a preponderance of proof, finding true the testimony of a lesser number as against a greater number of witnesses, determining their credibility, and that the jury are exclusive judges of the effect and value of evidence.

There was no error in instructing that the testimony of a police officer is to be judged by the standards applied to all other witnesses. In this case they were not accomplices, and because of that fact it was not error to instruct that ''an essential element of the crime of bribery is that the subject matter upon which the bribe is to operate actually exists and has been or can be brought before the officer in question in his official capacity.'' That instruction is California Jury Instructions, Criminal No. 776 and has been approved. Whether a chief of police will enforce the law against social vices is always before him.

Defendant's proposed instructions 55, 56·and 57 were effectually included in the instructions given. They deal with the law of entrapment; ensnaring the accused; giving of a present to a public official after he has acted on a matter. Jurors are presumed to have understood the instructions and repetition is not to be encouraged. (*People* v. *Fitzpatrick*, 78 Cal.App. 37, 44 [247 P. 601].)

Defendant's proposed instruction 7 would have directed that the law knows no creed or nationality and that ''every defendant, whatever his race, color or condition . . .

stands equal before the law and should be tried with perfect impartiality." There was no occasion to say more on the duty of the jurors to guard cautiously the rights of the accused than is contained in the court's charge. Nothing in the evidence indicated any prejudice against the race, color or creed of appellant.

There was no coercion of the jury. At 10:25 p.m. the court had them returned into court and asked how they stood numerically. The foreman answered "11 to 1." The Court: Do you think there is a chance to agree? Foreman: I believe so. The Court: There ought to be at 11 to 1. All right, retire with the bailiff." Nothing was said that in the slightest degree could be reasonably construed as indicating which side the court favored. It was not only proper but it was the court's duty to recommend that the jury arrive at a verdict. (*People v. Selby*, 198 Cal. 426, 439 [245 P. 426]; *People v. Miles*, 143 Cal. 636, 637 [77 P. 666].) *People v. Walker*, 93 Cal.App.2d 818 [209 P.2d 834] is not apropos. There the court had learned that the jury stood 10 to 2 for conviction. When they were directed to retire for further deliberation, the court saying that where they stand 10 to 2 they ought to reach an agreement, it was an indication that the judge could see no reason why the two could not give up the struggle. Similar behavior was the ground for reversal in the several cases cited by the court in support of its reversal of the Walker judgment. In the action at bar no intimation had been given as to which way the majority had voted before the judge ordered the retirement of the jury at 10:25 p.m. with the consent of both counsel. When they returned at 11 o'clock to hear the judge say that he had made arrangements at a hotel, speaking through their foreman, the jury indicated their preference "rather to settle it tonight than to break up the session." They had been directed to adhere to their decisions until convinced they were wrong and not to change merely to reach a verdict. Nothing was said by the judge that can be reasonably interpreted as his favoring a verdict of conviction.

The judgment and the order denying the motion for a new trial are affirmed.

McComb, J., and Wilson, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 17, 1950.