[Crim. No. 1018. Fourth Dist. Apr. 27, 1955.]

THE PEOPLE, Respondent, v. AL BENNETT et al., Appellants.

Thomas Whelan for Appellants.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, James Don Keller, District Attorney (San Diego), Barton C. Sheela, Jr., and Jack R. Levitt, Deputy District Attorneys, for Respondent.

BARNARD, P. J.—In an amended indictment the defendants were accused of a conspiracy to commit the crime of asking or receiving bribes by a public officer. They were also accused in six counts of asking or receiving bribes by a public officer; in three counts of grand theft; and in two counts of attempted grand theft.

Count One charged that the three defendants and certain unknown persons conspired to commit the crime of asking or receiving bribes by a public officer, and alleged that Bennett and Steetle did agree to accept and solicit bribes on behalf of Berry, an executive officer of this state, to wit: district liquor control officer of the State Board of Equalization. Five overt acts in furtherance of said conspiracy were alleged.

Counts Two, Four, Six, Eight and Ten charged the defendants with grand theft or attempted grand theft and need not be considered since all defendants were found not guilty on those counts.

Count Three charged that Berry and Bennett committed the crime of asking or receiving bribes by public officers or employees, in violation of section 68 of the Penal Code, it being alleged that on December 3, 1952, they asked, received, and agreed to receive a bribe from one Lyman Lucore in the sum of $7,000 ''upon an understanding and agreement that the vote, opinion or action upon matters which would be brought before'' Berry in his official capacity as an executive officer of this state would be influenced thereby. The remaining counts, in similar language, charged the commission of the crime of asking or receiving bribes by public officers or employees, in violation of section 68 of the Penal Code. In that manner Count Five charged Berry and Bennett with asking or agreeing to receive a bribe from one Jack Millspaugh on December 15, 1953, in the sum of $4,000. Count Seven charged Berry and Bennett with asking or agreeing to receive a bribe from one Mathew Howard on October 15, 1953, in the sum of $4,000. Count Nine charged Berry, Bennett and Steetle with asking or receiving such a bribe from one Shoberg on January 5, 1953, in the sum of $7,000. Count Eleven charged Berry, Bennett and Steetle with asking or receiving such a bribe from one Dodds on December 1, 1953, in the sum of $4,500. Count Twelve charged Berry and Bennett with asking or agreeing to receive such a bribe from one Gillette on June 1, 1952, in the sum of $5,000.

A jury found all three defendants guilty on Count One, the conspiracy count. Berry and Bennett were found guilty on Counts Three, Five, Seven, Nine, Eleven and Twelve. Steetle was also found guilty on Counts Nine and Eleven. Motions for a new trial were made and denied and all three defendants were sentenced to state prison. With respect to each defendant some of the sentences were to run consecu-

tively, and to run concurrently with relation to other counts. Fines were also imposed on each defendant with respect to certain counts. All three defendants appealed from the judgments and from the orders denying their motions for a new trial. Subsequently, Berry's appeal was dismissed at his request, and this appeal is presented on behalf of Bennett and Steetle.

Berry was district liquor control officer in charge of the San Diego office of the Board of Equalization. Bennett was a business opportunity broker, his office being adjacent to the Board of Equalization office in San Diego. Steetle was associated with Bennett in that business, and in the same office. The state fee for on-sale general liquor license was $525, and there was a restriction on the number of such licenses which would be issued. These licenses were transferable and at the times here in question they had a value, as soon as issued, of about $10,000 on the resale market. While anyone was allowed to make a preliminary application for a license, a formal application with payment of the statutory fee could only be filed with the permission of Berry, and he never delegated that authority to any of his subordinates. In no instance was a person who was allowed by Berry to file a formal application ever turned down by the Board of Equalization on the issuance of that license.

With respect to Count One, the conspiracy count, Harold Dodds testified as follows: During the fall of 1953 he learned that new on-sale general licenses were to be issued. He wrote a letter to the Board of Equalization asking permission to apply for one of these on-sale licenses. In response to this he received a preliminary application which he executed and returned to the board. Shortly thereafter, he received a visit from appellant Steetle who informed him that he thought that he, Dodds, would be able to obtain one of these licenses but in order to do so he would have to pay the sum of $4,500 in cash. Shortly thereafter he went to the office of Steetle and Bennett, and there met Bennett. He asked Bennett if he could pay for the license by paying $3,500 in cash and giving a note for $1,000. Bennett agreed, and he paid the money and signed the note. After Bennett agreed to this he picked up the telephone and called someone and said: "I am sending Harold Dodds over shortly." Bennett then told Dodds to go to the office of the board and see Berry and make his application for a license. Dodds walked next door to the Board of Equalization and was taken im-

mediately into Berry's office, where he saw his preliminary application form on Berry's desk. After a brief discussion Berry took him out to the counter and had the girl type up his formal application for a liquor license. Shortly thereafter Dodds received a general on-sale liquor license.

Dodds' testimony is corroborated by the testimony of Jack Millspaugh, who testified that when he was seeking a general on-sale license he asked Bennett what assurance he would have that he would receive his license if he paid $4,000; and that Bennett replied that when the money was paid he would phone Berry and "give him the green light and then I would go over and fill out the final application and pay $525.00." Two other witnesses, not involved in any of the counts, testified that during the fall and winter of 1953 they put in preliminary applications for licenses and that shortly thereafter they were contacted by Steetle who solicited them for the payment of money to cause the issuance of the licenses. It further appears from the evidence that all of the witnesses, five in number, who refused to make the payment asked did not receive liquor licenses; and those witnesses who did make such payments, eight in number, did receive licenses.

Another witness, Gillenberg, testified that in 1951 he attempted to get a seasonal liquor license for his premises at Jacumba, that he was not allowed to file an application until he was finally approached by Mr. Provart, who was then employed as a liquor control officer under Berry; that Provart asked him for $5,000; that he later paid $5,000 to another man; and that he was then allowed by Berry to file his application. Incidentally, Provart testified that he received $400 from Berry "as his part in the Gillenberg transaction." Gillenberg further testified that in the fall of 1952, he tried to apply for an on-sale general license which had a resale value and was refused; that on October 25, 1952, Bennett came to his premises and told him that the only way he could get such a license was by paying $2,500 in cash. Bennett and his wife accompanied Gillenberg to a bank where the latter secured the money. Gillenberg then paid the money to Bennett, but not in the presence of the woman. Shortly thereafter, he was notified that he could apply for his on-sale general license, was allowed to do so by Berry, and received that license. The testimony with respect to some of the other counts is also applicable to Count One.

The evidence with respect to Count Three shows that Mr. Lucore had made inquiries about the possibility of applying

for a license. Shortly thereafter, in the latter part of November, 1952, Bennett came to Lucore's premises and told him that the only way he could get a license was by paying $7,000 in cash. Lucore agreed to this and went to Bennett's office where he handed him $7,000 in cash. He was then instructed to go next door to the office of the board and see Berry, and make application for a general on-sale license. He did this and received his license. With respect to Count Five, the evidence shows that Millspaugh attempted to apply for a license and was given a preliminary application form to fill out. Because of gossip and rumor which he had heard he asked Mr. Cameron, a liquor control officer in the office of the board, whether or not this was going to be a legitimate transaction and if not how much he would have to pay for his license. Mr. Cameron told him ''I can't talk to you about that, you will have to see Mr. Bennett or Mr. Berry.'' The next day he received a phone call from Bennett saying that Bennett wanted to talk to him. He went to Bennett's office and Bennett suggested that they go outside and talk. They went outside where Bennett informed him that in order to get a license he would have to pay $4,000 in cash. Millspaugh protested and asked how the money was to be distributed. Bennett refused to discuss this matter at any length. Millspaugh then asked Bennett what would happen when he paid the money. Bennett informed him that he would pick up the phone and call Berry and he would get his license. Bennett also informed him that this money should be in cash and should be withdrawn from bank accounts in such a manner that the money could not be traced. Millspaugh had later conversations with Bennett and on his last phone call Bennett informed him that due to the investigating committee's activities there was too much ''heat,'' and the transaction would have to be called off at that time.

With respect to the seventh count Howard testified that he wanted to obtain a license and was told by Berry that none was available. He was then referred by Berry to Bennett, and went to Bennett where they discussed the acquisition of such a license. Bennett finally suggested that he would be able to get a new license by the latter part of 1953 by paying $4,000 in cash. Howard was unable to raise that amount. He further testified that in one conversation Berry told him that he, Berry, alone would decide whether or not any person got a liquor license. With respect to Count Nine, Shoberg testified that he desired to obtain a license and inquired among many

people in the trade as to how to go about it. He was given a phone number to call, this being the number of Bennett's office. He called during the fall of 1952 and Steetle identified himself as the party on the other end. A few hours later Steetle came to his premises and told him it would cost $7,000 in cash to get such a liquor license. Shoberg agreed, and when he had raised the $7,000 in cash he called Steetle and was told to come to his office. He did so, whereupon Steetle asked him to take a ride in Steetle's car. They drove to a point in San Diego and parked, and Shoberg handed Steetle a sack containing $7,000 in cash. Steetle counted the money and they then returned to Steetle's and Bennett's office. A few minutes later Steetle instructed Shoberg to go to the office of the board and make his application. He went there, and Berry allowed him to make the application and a liquor license was issued.

The testimony of Mr. Dodds with respect to Count Eleven has been sufficiently referred to, and need not be repeated.

With respect to Count Twelve, Gillette testified that during the summer of 1952 someone visited his premises and left Berry's card with instructions to call Berry. He called Berry and shortly thereafter Berry came to see him. Berry asked him if he wanted a seasonal license and told him it would cost $5,000 in cash in order to obtain it, and that the money should not all be drawn from one bank account so it could not be traced. Gillette refused to do this and was never issued a liquor license.

There was considerable other evidence applicable to all counts which showed a common scheme or design among Berry and the two appellants. Several other witnesses testified to similar experiences in getting licenses for themselves or their friends, and similar activities on the part of Bennett or Steetle. The evidence discloses that in many instances large sums of cash were paid to Berry, Bennett or Steetle for which receipts were never given; that much secrecy was engaged in by Berry and the appellants in their dealings with potential licensees; that in all cases where such payments were received licenses were issued; and that in every instance where such payments were refused, whatever the reason therefor, no license was ever issued.

The appellants admit that there was evidence as above briefly summarized but contend that, for various reasons, the evidence was insufficient to support the verdicts. With respect to the first (conspiracy) count, it is argued that there

is no evidence that either Bennett or Steetle was acquainted with Berry, and no evidence that either of them was ever in the office of the Board of Equalization; that there is no evidence that Bennett or Steetle made any statements to any of the victims as to how the amounts paid were to be used; that any evidence tending to support the conspiracy charge is entirely circumstantial; that the only circumstances from which a conspiracy could be inferred are those appearing in the testimony of Dodds; and that his testimony is deficient in failing to show that when he saw Bennett he told Bennett about his previous conversation with Steetle. It is further argued that if the evidence was sufficient to show any conspiracy, it showed several conspiracies between other persons and Berry, with which the appellants were not connected; and that it follows that the testimony of some of the witnesses was hearsay and inadmissible as against the appellants. There is no merit in this latter contention. Only one conspiracy was shown, and the court and jury were justified in believing that each of the transactions disclosed by the testimony was a part of a single general conspiracy to ask or receive bribes in connection with the issuance or proposed issuance of such liquor licenses. (*Bompensiero* v. *Superior Court*, 44 Cal.2d —— [281 P.2d 250].) ■ As to the other contentions, a conspiracy may be proved by indirect evidence, and inferences justified by the circumstances. There was ample evidence of an association between Bennett and Steetle and of a common design and concert of action between them and Berry. ■ The evidence, with the reasonable inferences therefrom, supports the verdicts as to the First Count. (*People* v. *Benenato*, 77 Cal.App.2d 350 [175 P.2d 296]; *People* v. *Steccone*, 36 Cal.2d 234 [223 P.2d 17]; *People* v. *Chait*, 69 Cal.App.2d 503 [159 P.2d 445]; *People* v. *Collier*, 111 Cal.App. 215 [295 P. 898]; *People* v. *Malone*, 20 Cal.App.2d 1 [66 P.2d 216].)

With respect to the third count, it is argued that Lucore did not remember the date on which he paid the money to Bennett; that there is no evidence that he told Berry that he had paid the money to Bennett; that it might be inferred that Lucore freely and voluntarily turned $7,000 over to Bennett without asking what it was to be used for; and that "It may well be that Mr. Bennett saw an opportunity to pick up what is known in F.H.A. financing circles, as a 'windfall.'" With respect to Count Five, it is argued that Millspaugh was interested and biased; that sometime during his negotiations with Bennett he decided to cooperate with

the district attorney, and that it appears from his testimony that he thereafter made plans to entrap Bennett by giving him marked money. It is also pointed out that there is a conflict between his testimony that Bennett made no comment when he told Bennett that he had heard that Bennett got everything over $2,000 and that Berry and Bonelli got the rest, and his testimony before the grand jury that he had told Bennett that he understood that $2,000 of it went to Bonelli and that he, Bennett, kept the rest, to which Bennett replied "I don't get that much." With respect to the seventh count, it is argued that Howard also testified that he originally borrowed $4,000 from his landlord which he later returned to his landlord; that he later was unable to secure the $4,000 required; that Bennett had not told him what was supposed to happen to the $4,000 which he was supposed to pay; that there was nothing in Howard's testimony indicating that Bennett was working in concert with Berry; and that the weight of the evidence indicates that Howard was trying to get someone to take money from him in order that he might obtain a license.

With respect to Count Nine, it is argued that Shoberg's testimony made no reference to Bennett or Berry; that Steetle testified that he had nothing to do with Shoberg's obtaining a license and received no money from Shoberg; and that there was other evidence that Bennett was absent from San Diego from December 6, 1952, to January 6, 1953. With respect to Count Eleven, it is argued that Dodds did not testify that Bennett told him that the money was to be used to offer a bribe to either Berry or anyone connected with the Board of Equalization; that he testified that he never knew where the money was to go; and that it cannot be reasonably inferred that the money thus collected by Bennett was to be turned over to Berry for the purpose of influencing Berry's official action or conduct. With respect to Count Twelve, it is argued that the evidence shows no connection by the appellants with the transaction with Berry, to which Gillette testified.

We find no evidence in the record which would connect Bennett with the transaction referred to in Count Twelve, or which would support the verdict finding Bennett guilty as to that count. With respect to the other substantive counts, Three, Five, Seven, Nine and Eleven, appellants' arguments relate to questions of fact presented by all of the evidence and make no allowance for the inferences which could reasonably be drawn from the evidence received. The evidence, as a

whole, was sufficient to support the verdicts with respect to those counts. When considered in its entirety the evidence strongly supports the verdicts as to all counts, with the exception of Count Twelve.

 It is contended that the court erred in denying a motion to quash this indictment and in overruling a demurrer thereto. It is argued that at the time these actions were taken the court had before it the transcript of the testimony before the grand jury; that where more than one conspiracy is involved each conspiracy must be pleaded in a separate count; that, where there are several conspiracies, testimony relating to one would be hearsay and inadmissible as against a defendant involved only in other conspiracies; and that, where a central figure is involved in several conspiracies who deals with different individuals in the various conspiracies, and all the evidence is received as against all of the parties, although only one conspiracy is charged, a conviction thus obtained is void except as to the central figure who participated in all of the conspiracies. It is argued that this principle is established in the cases of *Kotteakos* v. *United States*, 328 U.S. 750 [66 S.Ct. 1239, 90 L.Ed. 1557], and *Canella* v. *United States*, 157 F.2d 470. The Kotteakos case was distinguished in *Blumenthal* v. *United States*, 332 U.S. 539 [68 S.Ct. 248, 92 L.Ed. 154], where it was held that in a prosecution for selling whiskey at overceiling prices the fact that certain salesmen did not know of the action of other salesmen, and that each defendant salesman aided in selling only his part of such whiskey, did not show the existence of more than one conspiracy but established a single conspiracy of which several actions were merely integral steps. Only one conspiracy was here alleged, of which the various transactions disclosed by the evidence were a part. No error appears in denying the motion to quash, in overruling the demurrer, or in the admission of the evidence referred to in this connection. (*People* v. *Hess*, 104 Cal.App.2d 642 [234 P.2d 65]; *Bompensiero* v. *Superior Court*, 44 Cal.2d —— [281 P.2d 250].)

 It is next contended that the court erred in denying a motion for a change of venue to another county. Several affidavits were filed to the effect that the affiants did not believe that the defendants could receive a fair trial in that county, and that affiants had talked to numerous other people who entertained the same opinion, based upon the publicity in the newspapers which had occurred. The appellant Bennett filed such an affidavit, in which he included a statement

of opposition to a trial before any judge of the superior court of San Diego County, on the ground of bias and prejudice. In his affidavit he alleged that the council of churches of San Diego had voiced opposition to the issuance of new licenses in 1946 and in 1952; that the council of churches had such influence that the city council, board of supervisors and other officers of the city and county also opposed the issuance of such licenses; that these repeated attacks upon the issuance of licenses caused affiant to believe that the citizens of San Diego County generally thought there was graft involved in the issuance of such licenses; that the council of churches has influenced the two daily San Diego newspapers to oppose the issuance of such licenses; that affiant has talked with many individuals in the city and county of San Diego who believed that he could not have a fair and impartial trial there; that all of the foregoing has built up in that city and county a widely held conviction that this affiant is guilty as charged in the indictment; that this action has received such extensive publicity, adverse to affiant, that it appears probable that he cannot have a fair and impartial trial in that county; that it also appears probable that he could not have a fair trial before any judge living in that county; that the affiant has heard that the district attorney plans to bring additional indictments against the affiant during the trial for the purpose of prejudicing the cause of affiant in the pending case; and that because of this publicity and local prejudice it would be for the best interest of this affiant and the administration of justice that he be tried before a judge from outside San Diego County, free from the reaction created by the council of churches and the daily newspapers of San Diego.

Eight newspaper clippings were attached to the affidavits. These articles related to hearings before the grand jury and the Board of Equalization, and referred to a number of different people. Some of them referred to these appellants and what they had said or refused to say. Practically all of the allegations of the affidavits were conclusions, and we find no factual matters therein which would justify a conclusion that a fair trial could not be had in that county. That county has a large population, these newspaper articles were similar to those usually found in connection with any case involving matters which create a rather wide public interest, and they largely mentioned other people and proceedings other than this action, although the appellant Bennett was mentioned in most of them. There was no state-

ment that he was guilty and no threat against him appears. The court has a wide discretion in passing on such a motion and the record does not indicate that this discretion was not properly exercised. Unusual freedom was allowed in examining prospective jurors, including their reaction to any such publicity, and while considerable time was devoted to selecting a jury no unusual difficulty in selecting one appears. The defendants did not exhaust their peremptory challenges and at the conclusion of that proceeding appellants' counsel expressed himself as satisfied with the jury. In his opening brief counsel states that he is convinced that the trial judge did his best to give the defendants a fair and impartial trial. While there was naturally a large amount of publicity about that time, in connection with several matters of this general nature, there was no unusual publicity in connection with this particular case, and the record fails to reveal any abuse of discretion in this respect. (*People* v. *Mendes,* 35 Cal.2d 537 [219 P.2d 1]; *People* v. *Agnew,* 77 Cal.App.2d 748 [176 P.2d 724]; *People* v. *McCracken,* 39 Cal.2d 336 [246 P.2d 913]; *People* v. *Walker,* 112 Cal.App.2d 462 [246 P.2d 1009].)

In their closing brief appellants argue that the court should have granted a continuance until the prejudicial effect of the publicity had worn off, citing *Delaney* v. *United States,* 199 F.2d 107. Our attention is called to no request for such a continuance, and the facts of this case are easily distinguishable from those in the Delaney case. (*United States* v. *Flynn,* 216 F.2d 354.)

Some contention is made that the court improperly admitted evidence, as against these appellants, and erred in denying their motion to strike such testimony at the conclusion of the People's case. This is based upon their contention that the evidence showed a number of separate conspiracies and failed to show a general over-all conspiracy. For the reasons above given this contention is without merit. It is also argued that the court erred in permitting an amendment to the indictment shortly before the prosecution rested its case. ■ Complaint is made of the fact that the date alleged in overt act No. 2 was allowed to be changed from December 8, 1952, to December 3, 1952. It is argued that this was prejudicial to appellant Bennett, because there was some evidence that he was in Texas on December 8, 1952. Aside from other considerations, which need not be gone into at length, no error appears. (*People* v. *Biggs,* 9 Cal.2d 508 [71 P.2d 214, 116 A.L.R. 205]; *People* v. *Wright,* 26 Cal.App.2d 197

[79 P.2d 102].) It is further argued in this connection that the defendants were not thereafter required to again plead to the indictment as thus amended. No prejudice appears. (*People* v. *Bryant,* 101 Cal.App. 84 [281 P. 404]; *People* v. *Finkelstin,* 98 Cal.App.2d 545 [220 P.2d 934].) While an objection to the amendment was made on the ground that the defendants had already gone to trial, no request was made for additional time in which to prepare a defense, or for other relief, and no attempt was made to indicate to the trial court how any prejudice might result.

Finally, it is contended that the court erred in instructing the jury. It is argued that the court instructed the jury that the victims in these transactions were not accomplices, and that their testimony need not be corroborated; and that the jury should have been permitted to determine, as a factual matter, whether or not the people whose financial transactions were the subjects of Counts Three, Five, Seven, Nine, Eleven and Twelve were accomplices whose testimony required corroboration. Reliance is placed on *People* v. *Wayne,* 41 Cal.2d 814 [264 P.2d 547] and *People* v. *Harper,* 25 Cal.2d 862 [156 P.2d 249]. A distinction between the facts in those cases and such facts as appear in the instant case is pointed out in *People* v. *Clapp,* 24 Cal.2d 835 [151 P.2d 237], and in *People* v. *Brigham,* 72 Cal.App.2d 1 [163 P.2d 891]. ▮ In the latter case, in discussing section 68 of the Penal Code, it was stated that there was nothing in the language of the section to suggest any intention to include the victim as an offender. A separate statute, section 67 of the Penal Code, is provided to cover the action of one who gives or offers a bribe to an executive officer. Such a person is not liable to prosecution for the identical offense charged against these appellants. (Pen. Code, § 1111.) Under these circumstances, these victims were not accomplices.

▮ It is further argued that by instructing the jury that eleven named witnesses, including Provart, "are accomplices as a matter of law, and this applies to the conspiracy count" the court in effect told the jury that a conspiracy had been proved as charged in Count One. No such effect can be given to that instruction, and in the instructions given, in relation to the conspiracy charge, the jury was told that each defendant was entitled individually to its determination as to whether or not that defendant was a member "of the alleged conspiracy, if any existed."

Several minor contentions are made which we have not

overlooked, but which require no specific attention. The record discloses no reversible error, and indicates that the appellants had a fair trial. We find nothing therein which would justify a conclusion that a miscarriage of justice has occurred.

The judgments and the motions appealed from are affirmed with respect to all counts except Count Twelve, and with respect to Count Twelve they are reversed.

Griffin, J., and Mussell, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied May 25, 1955.