[Crim. No. 1046. Fourth Dist. June 28, 1956.]

THE PEOPLE, Respondent, v. FRANK BOMPENSIERO, Appellant.

*Assigned by Chairman of Judicial Council.

Augustine, Bryans & Ragen and Frank Desimone for Appellant.

Edmund G. Brown, Attorney General, William E. James, Deputy Attorney General, James Don Keller, District Attorney (San Diego), and Jack R. Levitt, Deputy District Attorney, for Respondent.

MUSSELL, J.—In an amended indictment, appellant Frank Bompensiero, together with Charles Lyon and Louis Trapani and certain John Does and certain unindicted coconspirators, to wit, Charles Berry, Harry W. Steetle and Al V. Bennett, were charged in count one with the crime of conspiracy to commit the crime of asking or receiving bribes by a public officer, to wit, Charles Berry, executive officer of the State of California (District Liquor Control Officer of the State Board of Equalization). Eight overt acts alleged to have taken place in San Diego County in furtherance of the conspiracy were set forth, i.e., (1) That defendant Lyon called one Patterson on the telephone on January 20, 1953; (2) that Lyon instructed Patterson to make an application for an on-sale general liquor license about November 16, 1952; (3) that on January 20, 1953, Lyon instructed Patterson to bring him $7,000; (4) that defendant Trapani, about August 23, 1952, instructed two Ghio brothers to collect $7,500; (5) that about October 10, 1952, defendant Trapani instructed them to apply for an on-sale general liquor license; (6) that appellant Bompensiero, about February 27, 1951, instructed one Gillenberg to apply for a seasonal liquor license; (7) that about October 25, 1952, Bennett instructed one Gillenberg to obtain $2,500; and (8) that about December 15, 1952, defendant Trapani instructed one Schoenbeck to gather together $7,000. Counts two through nine charged certain defendants with the crimes of attempted grand theft, grand theft, and asking, receiving and agreeing to receive bribes, but appellant Bompensiero was not named as a defendant in these counts of the amended indictment. In count ten, appellant Bompensiero, defendants Berry and Bennett and certain John Does, were charged with violating section 68 of the Penal Code (asking and receiving bribes by public officers or employees) and it was alleged that on or about the 3d day of April, 1951, the named defendants did ask, receive and agree to receive a bribe from Ernest Gillenberg in the sum of $5,000. Count eleven likewise charged violation of Penal Code section 68, naming appellant Bompensiero, Berry, Bennett and certain John Does, alleging that on October 25, 1952, they did ask, receive and agree to

receive a bribe from Ernest Gillenberg in the sum of $2,500. Appellant Bompensiero was charged with having suffered a prior felony conviction in that on or about the 30th day of January, 1931, in the District Court of the United States, in the Southern District of California, he was convicted of the crime of violation of the National Prohibition Act and that he had served a term of imprisonment therefor in the penitentiary at McNeil Island.

Bompensiero moved to set aside the indictment and the trial as to him was continued due to the pendency of a proceeding in prohibition. (See *Bompensiero* v. *Superior Court,* 44 Cal.2d 178 [281 P.2d 250].) Trial was then had as to defendants Lyon, Berry, Bennett and Tapani which resulted in verdicts of guilty as to said named defendants and their convictions were affirmed on appeal by this court in *People* v. *Lyon,* 135 Cal.App.2d 558 [288 P.2d 57], except as to Berry whose appeal was dismissed. On April 18, 1955, following the making and denial of certain motions and the filing of an amended indictment in which counts ten and eleven were amended by adding the word "receive," the matter proceeded to trial before a jury as to defendant Bompensiero. Verdicts were returned by the jury finding him guilty as charged in counts one, ten and eleven of the amended indictment. His motion for new trial was denied. Judgment was pronounced and he was sentenced to imprisonment in the state prison. He appeals from the judgment and the order denying his motion for a new trial.

The first of appellant's numerous contentions on appeal is that the court erred in striking from the record appellant's verified statement alleging bias and prejudice on the part of the trial judge. This contention is without merit. The record shows that on or about September 17, 1954, appellant filed in the instant action a statement that the trial judge was biased and prejudiced against him. This statement was stricken by the trial court and on appeal, the Supreme Court in *Bompensiero* v. *Superior Court,* 44 Cal.2d 183, *supra,* held that the trial judge was not in error in striking the statement on the ground that the remarks attributed to the trial court showed so little basis for claiming personal bias or prejudice against Bompensiero as to justify the conclusion that the charge of disqualification was sham and frivolous and on the further ground that Bompensiero's statement was not verified and was therefore formally defective. On April 18, 1955, appellant filed another document

with the superior court denominated "Statement of personal bias and prejudice of judge." In this statement he set forth the same remarks of the judge upon which he based his claim of bias and prejudice in the proceedings on the first statement reviewed by the Supreme Court and in addition set forth therein certain statements and remarks of the trial judge made at the time defendant's counsel was objecting to the jurisdiction of the court to continue the trial while prohibition proceedings were being conducted in the appellate court. These remarks, like those set forth in appellant's first statement, were not sufficient to show that the trial court was biased and prejudiced and the statement was properly stricken.

In *Ephraim* v. *Superior Court*, 42 Cal.App.2d 578 [109 P.2d 378], it was held that statements of disqualification of a judge are insufficient as a matter of law unless the facts constituting the alleged disqualification are set forth, and that mere allegations setting forth the conclusions of affiant do not comply with section 170 of the Code of Civil Procedure. In *People* v. *Lyon, supra,* 135 Cal.App.2d 558, 584-585, the appellant contended, as here, that the trial court failed to comply with section 170 of the Code of Civil Procedure with respect to his own claimed disqualification and this court there held that the refusal of the trial judge to submit the claim of disqualification asserted by Lyon, a codefendant of appellant Bompensiero herein, for consideration was proper.

■ Bompensiero, in points two, three, four and five of his opening brief, claims that the trial judge had no jurisdiction to pass upon the preliminary motions and demurrer, to sit as a trial judge, to hear and pass on appellant's motion for a new trial, and to pronounce judgment. These four contentions are based upon the premise that the trial court erred in striking from the record the "Statement of personal bias and prejudice of judge" and since we have concluded that the statement was properly stricken, it follows that the court had jurisdiction to pass upon the matters stated in said points two, three, four and five.

Appellant contends that the evidence was insufficient to support the verdicts and the judgment. The consideration of this contention involves a somewhat lengthy statement of the testimony produced by the prosecution.

Charles J. Cameron testified as follows: He was employed by the Board of Equalization in San Diego from September 1, 1947 until the time of trial and after July 1, 1948. his superior officer was Charles E. Berry. Prior to the fall of

1953, when general licenses were available, anyone desiring a general license would have to talk to Mr. Berry, the district administrator, and that only Charles Berry accepted applications for formal liquor licenses. After the fall of 1953, preliminary applications were issued to everyone who had a business or a lot but Mr. Berry screened them and only with his approval could a formal application be filed. In no instance, to his knowledge, was a formal application approved by Mr. Berry ever turned down by the board in Sacramento. The market value of on-sale general licenses in 1952 and early in 1953 was around $12,500 and thereafter it was around $7,500. General licenses were limited to one per thousand population within the county and there is no resale market in seasonal licenses. A license, once approved, is transferable by the person named in the license. Until July 1, 1954, the fee for on-sale general license in the city of San Diego was $525 and $325 in the county area. Al Bennett's place of business was between 100 and 150 feet north of the Board of Equalization building in San Diego and was visible therefrom. He testified further that during the last part of 1954 the records of the Board of Equalization were under his care and control and that he became familiar with the signature of Mr. Berry. He identified certain files and records of the Board of Equalization and stated that in every instance when a person filled out a formal license and paid the fee, he was granted a license. Mr. Steetle was one of Al Bennett's salesmen and the witness had seen both Steetle and Bennett talking to Mr. Berry and had seen Frank Bompensiero at the Board of Equalization from time to time.

Al Tossas testified that one William Cook instructed him to come to San Diego for the purpose of selling seasonal licenses and to collect campaign funds for the William G. Bonelli campaign. He was asked to check several locations for the possibility of the issuance of seasonal licenses and was told to quote the price in one or two cases. He was told that this money was to apply to the campaign fund or to pay accumulated bills. Mr. Cook told him to use as a part of his sales talk the statement that after a period of time it would be possible to convert a seasonal into a general license. He picked up money on seasonal licenses in Orange and San Bernardino Counties and carried sealed envelopes from Charles Berry, the district liquor control administrator of San Diego and Imperial Counties to William Cook and vice versa. He stated also that he had received $500 from Frank

Bompensiero as contributions for William G. Bonelli's campaign in 1950.

Ira M. Provart testified that he was formerly employed by the Board of Equalization as liquor control officer in El Centro and as such was acquainted with Charles Berry, who was the administrator in the San Diego and Imperial County area. He was asked by Ernest Gillenberg, who operated the Barbara Worth Café in Jacumba, if it would be possible that he could get a seasonal license. He, Provart, brought this to Mr. Berry's attention and Berry told him to tell Gillenberg that he could but it would cost him $5,000. Gillenberg said he could afford only $3,500, which statement he relayed to Mr. Berry. Berry asked him if he thought Frank Bompensiero could talk to him and when and Provart said "I suppose so," and Berry said to tell Mr. Gillenberg that Frank would come and see him. "He asked me to stop and see Mr. Gillenberg so I stopped in Mr. Gillenberg's place in Jacumba and told him a man by the name of Frank B. would come to see him. He asked me his name and I said "I don't think you will remember his full name, but he will make himself known to you when he comes in"; that Gillenberg came to the El Centro office and made an application for an on-sale seasonal license, saying that Frank told him to make an application; that Frank Bompensiero told him he had met Gillenberg in the Grant Hotel and had received a check from him; that Frank Bompensiero told him he was to have delivered to him a sum of money, alone, but instead he came with his wife and that he had some trouble dodging around the pillars, trying to keep away from her; that Bompensiero further stated that to avoid being apprehended with the money he had made arrangements with a former employee to shake hands with him and "palm off" whatever he had received; that Mr. Berry had told him that he needn't expect very much out of this because by the time it was cut 10 or 11 ways, there wouldn't be much for him; that later Mr. Berry handed him $400 in an envelope, saying, "This is your share of the Gillenberg deal" and that in a subsequent conversation about Gillenberg, Frank Bompensiero said "Well, I hope that so-and-so will sell his place because he just talked too much."

Ernest M. Gillenberg testified that in 1951 he acquired a seasonal cocktail license for the Barbara Worth Café in Jacumba; that Frank Bompensiero came into his place early in 1951 and told him he could get him a seasonal license but it would cost $5,000 in cash money and that after he had

operated a year he could get a regular general license. Gillenberg saw Mr. Provart and asked him about Frank Bompensiero and filled out his application. He waited several weeks hoping the license would come through without paying $5,000. He was instructed to meet Frank Bompensiero in the lobby of the U. S. Grant Hotel and to bring $5,000 in cash. He purchased a $5,000 cashier's check, payable to himself and met Bompensiero; that Bompensiero, after walking behind a pillar, didn't want to accept the check, asking for money, but finally took the check. Gillenberg obtained a seasonal license after paying the check and asked the board about making application for a general license. He received a telephone call from Al Bennett, wanting to talk to him. He told Al Bennett he understood he was to get a general license without paying any additional amount but Bennett told him he had to pay $2,500 more and that was the only way he could get one; that he paid Bennett $2,500 in cash, after driving with him to El Centro and withdrawing it from the bank. The money was paid beside the car, outside the presence of a woman Mr. Bennett introduced as his wife, and Bennett told him he would be informed when to come in. He received a telephone call to that effect, made an application and received his general license. Gladys Gillenberg testified that she was present at the Grant Hotel in San Diego when her husband delivered the check for $5,000.

Louis C. Davis, handwriting expert, testified as to the signature on Frank Bompensiero's booking sheet and bank signature card and stated that in his opinion the endorsement "Frank Bompensiero" on the back of the $5,000 cashier's check was the signature of the same person who had signed the booking sheet and bank signature card.

Thomas B. Colby testified that he operated a country club prior to April of 1952; that he saw Mr. Berry and was told it would be impossible to secure a liquor license; that Louis Trapani told him it would cost $5,000 for a seasonal license and that it would have to be in cash; that he received a call asking him to bring the money and pay it at the Santa Anita race track and that he did so and was told to put in his application and thereafter he received a seasonal license; that he was told that later in the year, when a new batch of licenses would be available, he could convert the seasonal into a general on-sale license for $2,500 extra; that later Trapani asked him for $2,500 more, which he paid, and that he applied for and received a general license.

Earl E. Jacobs testified that he was the owner and operator of the Lakeland resort; that he had a seasonal license and that he talked to Mr. Berry about obtaining an on-sale general cocktail license and was told they were getting $3,000 to $4,000 for them; that he applied for an on-sale license and was given a formal application for one in December, 1952; that Mr. Berry told him they were getting $2,500 for them; that arrangements were made for him to bring in $500 and spread the balance out; that he was allowed to make an application and placed $500 in a drawer of Mr. Berry's desk and in Mr. Berry's presence, following an agreement to pay $2,500 to Mr. Berry; that he later paid an additional $500 in the same manner at the same place and received an on-sale general license but was told he could forget the balance due to his having sustained a broken back.

Tony M. Silva, a motel operator, testified that Al Bennett came to see him and asked if he wanted a seasonal license, saying it would cost him $5,000; that he agreed and gave him $1,000 down payment and later $2,000 and the final $2,000 when he went to sign an application; that he was given a receipt each time; that these receipts were taken by Bennett; that Bennett, after the final payment, told him to see Mr. Berry; that he did so and Mr. Berry had the papers ready and that he then obtained the seasonal license; that he later obtained a new issue general license after Bennett came to see him again and that Bennett said he would charge $2,500 for it; that he gave Mr. Bennett the money without obtaining a receipt and was sent over to the board, where the papers were again ready.

Harry C. Patterson, operator of a tavern having a beer and wine license, testified that he acquired an on-sale general license by contacting Charles Lyon in Los Angeles; that Lyon told him he would have to pay $8,000 for the license and told him to see Berry at the equalization board; that he told Berry he had seen Lyon and was told by Berry that Lyon was one of the best friends that anybody ever had; that he received an on-sale general license and paid $1,000 to Mr. Lyon; that he did not obtain a receipt from him and was told by Lyon that he couldn't give him one; that he did not pay the balance of the $8,000 although Lyon twice asked him for it, once saying that Mr. Bonelli was getting impatient; that Lyon told him to bring the balance of the money in a sealed envelope.

Cottardo Ghio testified that Berry told him they weren't

issuing licenses; that he thereafter saw Louis Trapani, who told him it would cost $7,500 cash; that he agreed to take the license and was told to meet Trapani in San Juan Capistrano with $7,500 in small bills; that later he was called by Trapani to go to Berry to make an application; that he and his partners tried to apply twice but were told by Berry that he knew nothing about it; that they informed Trapani of the conversation with Berry and later Trapani told him to apply for a license again; that he and his partners then filed an application and received a liquor license.

Ernest Bernardini testified that he operated a restaurant in San Diego under a beer and wine license; that Mr. Trapani and Mr. Ghio came to his place of business and told him that if he wanted an on-sale general liquor license it would cost him $7,000; that he was told by Trapani that the money would have to be paid in $50 and $100 bills; that he did not pay any money and did not receive a liquor license although he had made out an application.

Frank Cerda testified that he owned a tavern, the Mission Inn in Oceanside; that in the fall of 1953 he attempted to get an on-sale general license and filled out a preliminary application form; that thereafter Harry Steetle came to see him and asked him to go outside to his car to talk in regard to his liquor license; that Steetle told him he could get him a license for $4,700 in cash; that he did not talk to Steetle again and did not obtain a license.

Harold F. Dodds testified that he was an operator of a restaurant and bar and acquired a newly issued general on-sale license from the board of equalization; that he filled out a preliminary application and was then contacted by Harry Steetle, who told him there was a license available and it was to cost him $4,500 for the new issue; that he borrowed the money to purchase the license and took the money up to Bennett's office. He gave Bennett $3,500 and a note for $1,000; that Bennett placed a 'phone call, saying Harold would be over; that he went to the State Board of Equalization and saw Mr. Berry, who had his preliminary application on his desk; that he then filled out a formal application and received a liquor license.

H. F. Millspaugh, a resort owner, testified that in the fall of 1953 he attempted to get a liquor license from the State Board of Equalization in San Diego; that he filled out a preliminary application and a few days later received a telephone call from Bennett asking him to come to his office;

that Bennett told him he was in line for a license if he would
pay $4,000; that he was handling all the licenses and that
nobody could get a license unless he paid $4,000; that he
went back to Mr. Bennett for additional information and was
warned not to take money out of an account where it could
be traced and that it would have to be paid in cash; that
Bennett told him that as soon as the money was paid he would
give Mr. Berry the o.k. to issue the license; that he again
saw Bennett about the license and Bennett suggested he take
money out of the bank and go to Las Vegas and return in a
few days and complain about losing a lot of money; that he
told Bennett that he had heard Mr. Bonelli got half and
that he and Berry kept the rest; that Bennett indicated that
he didn't get as much as Millspaugh thought he did; that he
tried to talk to Bennett again but was told there was too
much heat on due to the Weinberger committee.

It is evident from the testimony of the witnesses named
that there was sufficient substantial evidence to sustain the
verdict of the jury finding appellant guilty of counts 1,
10 and 11 of the indictment. As to the conspiracy count,
the evidence set out shows that prior to the fall of 1953,
when licenses were available, anyone desiring such a license
would have to talk to Mr. Berry, the district administrator,
and that he was the only person who accepted applications
for formal liquor licenses. After the fall of 1953, preliminary
applications were issued to everyone who had a license or a
lot, but Berry secured them, and only with his approval could
a formal application be filed. Such applications approved
by Berry were never turned down by the board in Sacramento.
The market value of on-sale general licenses in 1952 and
early 1953 was around $12,500 and thereafter around $7,500.
Until July 1, 1954, the fee required by the state for the
issuance of an on-sale license was $525 in the city of San
Diego and $325 in the county area. The witness, Al Tossas,
was instructed by one Cook to come to San Diego for the
purpose of selling seasonal licenses and to collect campaign
funds for the William G. Bonelli campaign. Tossas picked up
money on seasonal licenses in Orange and San Bernardino
Counties and carried sealed envelopes between Berry and
Cook, and in 1950 he received $500 from appellant as contri-
butions for Bonelli's campaign. The witness Provart arranged
the Gillenberg transaction through Berry and appellant in
which Gillenberg paid $5,000 in cash to appellant for a
seasonal license and later paid $2,500 to Al Bennett for a

general license. Thomas Colby obtained a seasonal license upon payment of $5,000 in cash to Louis Trapani and obtained a general license upon payment of the further sum of $2,500. The witness Earl Jacobs obtained an on-sale license upon depositing $500 cash in a drawer in Berry's desk and agreeing to pay $2,500. Tony Silva was told by Bennett that a seasonal license would cost $5,000. Silva paid the money to Bennett who then told him to see Berry and the license was then issued. Later Silva obtained a general license upon payment to Bennett of $2,500. Harry G. Patterson obtained an on-sale general license by communicating with Charles Lyon in Los Angeles and paying him the sum of $1,000. The witness Ghio obtained a license upon payment to Louis Trapani of $7,500 in cash in small bills. Harold Dodds obtained a newly issued general on-sale license upon being contacted by Harry Steetle and payment to Bennett of $3,500, plus a note for $1,000. Bennett informed the witness Millspaugh that he was in line for a license if he would pay $4,000 and that nobody could get a license unless he paid that amount. Bennett warned Millspaugh not to take money for the license out of an account where it could be traced and that it would have to be paid in cash. ▉▉▉ The jury was justified in inferring from the testimony that the conspiracy existed as alleged in the indictment and that the payments were asked for and received by the conspirators in furtherance of the agreement to ask for or receive bribes on behalf of Berry, the district liquor control officer of the State Board of Equalization.

In *People* v. *Lyon, supra,* several of the witnesses in the instant action testified substantially the same as in the instant action and this court there held that only one conspiracy was charged and that the court and the jury were justified in believing that each of the transactions disclosed by the testimony was a part of a single and general conspiracy to ask and receive bribes in connection with the issuance or proposed issuance of such liquor licenses. The same reasoning and ruling applies in the instant case.

In *Bompensiero* v. *Superior Court, supra,* 44 Cal.2d 178, 184, the court said:

"The rule governing the sufficiency of the evidence to justify a suspicion of a conspiracy has been summarized as follows: 'Direct proof of a formal understanding between parties to the conspiracy is not required as the basis of an indictment or information. "(i)t was not necessary for the

State to prove that the parties actually came together, mutually discussed their common design, and after reaching a formal agreement set out upon their previously agreed course of conduct. The extent of the assent of minds which are involved in a conspiracy may be, and from the secrecy of the crime usually must be, inferred by the jury from the proofs of the facts and circumstances which, when taken together, apparently indicate that they are parts to the same complete whole.'' ' (*Lorenson* v. *Superior Court, supra,* 35 Cal.2d [49] 57-58 [216 P.2d 859].) The grand jury was justified in the belief that each of the transactions in which a bribe was accepted was part of a single general conspiracy to invoke a bribe for each new liquor license issued throughout the district.''

Bompensiero claims that there was no proof of any agreement between the parties named in the conspiracy count. ■ However, the gist of the crime of conspiracy, under section 182 of the Penal Code, is the unlawful agreement between the conspirators to commit an offense prohibited by statute, accomplished by an overt act in furtherance thereof. The agreement may be inferred from the acts and conduct of the parties in mutually carrying out a common purpose in violation of the statute. (*People* v. *Benenato,* 77 Cal.App.2d 350, 358 [175 P.2d 296].) In *People* v. *Steccone,* 36 Cal.2d 234, 237-238 [223 P.2d 17], it is said:

''As a general rule, a conspiracy can only be established by circumstantial evidence 'for, as the courts have said, it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design (5 Cal.Jur. 521); and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy (citing authority).' ''

In *People* v. *Bennett, supra,* 132 Cal.App.2d 569, 575 [282 P.2d 590], this court, in considering a previous appeal of defendant Bennett, said:

''There was considerable other evidence applicable to all counts which showed a common scheme or design among Berry and the two appellants. Several other witnesses testified to similar experiences in getting licenses for themselves

or their friends, and similar activities on the part of Bennett or Steetle. The evidence discloses that in many instances large sums of cash were paid to Berry, Bennett or Steetle for which receipts were never given; that much secrecy was engaged in by Berry and the appellants in their dealings with potential licensees; that in all cases where such payments were received licenses were issued; and that in every instance where such payments were refused, whatever the reason therefor, no license was ever issued."

In *People* v. *Vollmann*, 73 Cal.App.2d 769, 786 [167 P.2d 545], it was held that the offer or solicitation of a bribe need not be stated in express language as such; it is sufficient that the words used carried the import of a bribe and were evidently intended to bear that meaning; and that it is permissible to show the various steps taken by an accused in committing the crime, including preliminary negotiations.

Under the reasoning of the foregoing authorities it is apparent that sufficient facts were proven in the instant case from which the jury could infer that there was a common design and scheme entered into through the agreement of the defendants herein to ask and receive bribes for and on behalf of a public officer or employee and that it is apparent that the design was to obtain bribes in a considerable amount from persons desiring to obtain liquor licenses in the area over which defendant Berry was the district liquor control officer.

Appellant argues that the evidence is insufficient to sustain the conviction as to count 10 because it was not shown that Gillenberg had an understanding with appellant that the vote or action of Berry was to be influenced by the payment of $5,000. This argument is without merit. A general conspiracy was established and Gillenberg's testimony shows that he paid appellant $5,000 to obtain a seasonal license. Provart testified that he talked to Berry about the Gillenberg license and Berry told him to inform Gillenberg that it would cost him $5,000. Berry told Provart to tell Gillenberg that Frank would come and see him, and appellant told Provart that he had met Gillenberg in the Grant Hotel and had received a check from him. The testimony of Provart and Gillenberg, together with the evidence of the general conspiracy, was sufficient to support the verdict and judgment as to count 10.

Appellant argues that there was no evidence, direct or indirect, to support the charge in count 11. However, this

contention was considered by the Supreme Court in *Bompensiero* v. *Superior Court, supra,* 44 Cal.2d 178, and it was there held that since a general conspiracy might reasonably be supposed to have existed, prosecution might proceed under this count. The record shows that appellant told Gillenberg that after he had operated a year he could get a regular general license, and that if he so desired, to let somebody at the board know about it. Gillenberg then paid Bennett the $2,500. We conclude that the record contains substantial evidence to support the verdict and judgment on the charge contained in count 11.

■ Appellant contends that the trial court erred in permitting the prosecution to amend counts 10 and 11 of the indictment. This amendment was accomplished by interlineation, inserting the word "received" between the words "ask" and "agree to receive" in counts 10 and 11. The amendment was proper in charging a violation of section 68 of the Penal Code. A new crime was not thereby charged and the defendant could not claim surprise as he had the transcript of the grand jury proceedings in which the evidence shows that the sums of $5,000 and $2,500 were "received" as bribes on the dates in question. (See *Bompensiero* v. *Superior Court, supra.*) Appellant did not request a continuance and offered no protest when the court stated that it was not necessary to rearraign the appellant. He was not prejudiced by the amendment and no error resulted from it. (*People* v. *Finkelstin,* 98 Cal.App.2d 545, 556, 557 [220 P.2d 934].)

Appellant contends that the charge contained in count 10 of the indictment is barred by the statute of limitations. However, this contention was made and considered in *Bompensiero* v. *Superior Court, supra,* and by the court rejected. A detailed discussion of this contention is set forth on pages 185 and 186 of that decision and reference is hereby made thereto in answer to appellant's contention herein.

■ It is claimed that the trial court erred in overruling appellant's objections to and in denying his motion to strike the testimony of the People's witnesses relating to several alleged offenses other than the offense for which appellant was on trial. This testimony was admissible to show the common design of the criminal enterprise and extent of the criminal conspiracy, even though it may have tended to prove the commission of distinct criminal acts. (*People* v. *Collier,* 111 Cal.App. 215, 237 [295 P. 898].) In *People* v.

*Stevens,* 78 Cal.App. 395, 406-407 [248 P. 696], it is said that in conspiracy cases it is no objection that the evidence covers a great many transactions and extends over a long period of time, that it may show another crime, that the acts, evidence to show which is offered, occurred some time before the alleged formation of the conspiracy, provided, however, that the facts shown have some bearing on and tendency to prove the ultimate facts at issue. We find no error in the court's ruling on the motion to strike.

 Appellant argues that the accomplices' testimony was not corroborated. This argument is based upon the false premise that witnesses Gillenberg and Provart and others were accomplices. However, it is well settled that the giver and receiver of a bribe are not accomplices under section 1111 of the Penal Code. (*People* v. *Bennett, supra,* 569, 581; *People* v. *Lyon, supra,* 558, 576.) Furthermore, the testimony of Gillenberg was corroborated by that of his wife and other witnesses, the files of the board of equalization, the cashier's check for $5,000, and expert testimony as to appellant's signature on the back thereof. The rule is that the corroborating evidence is sufficient if it tends to connect the defendant with the commission of the crime in such a way as may reasonably satisfy the jury that the witness who must be corroborated is telling the truth. (*People* v. *Mac-Ewing,* 45 Cal.2d 218, 224 [288 P.2d 257].) It appears, therefore, that there was adequate corroboration of the testimony of the witnesses for the prosecution herein.

It is next contended that the trial court was guilty of misconduct and acted as an advocate on behalf of the prosecution. We are not in accord with this contention. Appellant, in his opening brief, devotes 36 pages to the discussion and statement of many excerpts from the reporter's transcript which he claims show that the trial court was guilty of misconduct. These excerpts relate mainly to the court's ruling on the admission of evidence and the claimed restriction of the cross-examination of witnesses. In this connection the court instructed the jury that if during the trial he had said or done anything which may have suggested that he was inclined in favor of the claims or position of either party that the jury should not be influenced by any such suggestion and that his object in asking questions of certain witnesses was to bring out in greater detail facts not then fully covered in the testimony.

Appellant further contends that the trial court committed

error by giving the jury improper instructions and by refusing to give instructions offered on behalf of appellant. There were many instructions given to the jury (Rep. Tr., pp. 1159-1660.) and it appears that when they are considered as a whole, the jury was fully and fairly instructed as to the elements of the offenses charged and as to the law applicable thereto.

Appellant complains that the court, in effect, told the jury (Rep. Tr., pp. 1603, 1607 and 1618) that a conspiracy was established as a matter of law. However, a reading of the transcript in this connection does not bear out appellant's contention. Appellant further states that the court, in effect, told the jury (Rep. Tr., pp. 1612 and 1614) that the moneys that the various witnesses testified they paid were bribes as a matter of law. We do not so read the instructions. In this connection the court was not instructing the jury that bribes were received as a matter of law but was instructing it as to the provisions of sections 67 and 68 of the Penal Code and as to who were and who were not accomplices.

Appellant complains that the court was acting as an advocate in behalf of the prosecution in his comments regarding accomplices and the weight to be given to their testimony. The record does not support this proposition. The jury was properly told that the testimony of an accomplice could not be used to sustain a conviction unless it was corroborated by evidence tending to connect the defendant with the commission of the offense.

Appellant claims that the court should not have given an example in discussing the law relative to conspiracies. The objection in this connection is that the court misled the jury as to the application of the statute of limitations. However, no prejudicial error appears in that connection as appellant's argument as to the application of the statute was determined adversely to him in *Bompensiero* v. *Superior Court, supra.*

It is argued that the trial court committed error and was guilty of misconduct in that he told the jury that the overt acts were "good overt acts." However, examination of the court's instruction in this connection shows that the court did not instruct the jury that the overt acts were good overt acts but stated that overt acts proven were "good overt acts."

Other complaints of appellant as to the instructions given are likewise without merit. It further appears that many of the instructions offered by appellant were covered by other instructions or did not accurately state the law and no prejudicial error resulted from the refusal to give them.

Finally, appellant contends that the court erred by invading the province of the jury during its deliberations. No error appears in this connection. The jury, during its deliberations, returned to court for further instructions and at the request of a juror, the court reread a portion of the instructions given relative to the question of the liability of persons charged with a conspiracy for the acts and declarations of persons not members of such conspiracy. The court then informed the jury that a person who committed a criminal act without having knowledge of a conspiracy would not be guilty thereof. It appears that the jury was fully and fairly instructed on the law applicable to the charges set forth in the indictment and that the court did not invade the province of the jury during its deliberations.

In view of what we have heretofore said, we deem it unnecessary to pass on other points raised by appellant.

The judgment and order denying motion for new trial are affirmed.

Barnard, P. J., and Griffin, J., concurred.

A petition for a rehearing was denied July 9, 1956, and appellant's petition for a hearing by the Supreme Court was denied July 24, 1956.